Christie Lee LITTLETON, Individually and as Next Heir of Jonathon Mark Littleton, Appellant,

v.

Dr. Mark PRANGE, Appellee.

No. 04–99–00010–CV.

Court of Appeals of Texas, San Antonio.

Oct. 27, 1999.

Dale Hicks, Jon A. Hyde, Maloney & Maloney, P.C., San Antonio, for Appellant.

Thomas F. Nye, Linda C. Breck, Brin & Brin, P.C., Corpus Christi, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: PHIL HARDBERGER, Chief Justice.

This case involves the most basic of questions. When is a man a man, and when is a woman a woman? Every school-child, even of tender years, is confident he or she can tell the difference, especially if the person is wearing no clothes. These

are observations that each of us makes early in life and, in most cases, continue to have more than a passing interest in for the rest of our lives. It is one of the more pleasant mysteries.

The deeper philosophical (and now legal) question is: can a physician change the gender of a person with a scalpel, drugs and counseling, or is a person's gender immutably fixed by our Creator at birth? The answer to that question has definite legal implications that present themselves in this case involving a person named Christie Lee Littleton.

### FACTUAL BACKGROUND

A complete stipulation of the facts was made by the parties in this case.

Christie is a transsexual. She was born in San Antonio in 1952, a physically healthy male, and named after her father, Lee Cavazos. At birth, she was named Lee Cavazos, Jr. (Throughout this opinion Christie will be referred to as "She." This is for grammatical simplicity's sake, and out of respect for the litigant, who wishes to be called "Christie," and referred to as "she." It has no legal implications.)

At birth, Christie had the normal male genitalia: penis, scrotum and testicles. Problems with her sexual identity developed early though. Christie testified that she considered herself female from the time she was three or four years old, the contrary physical evidence notwithstanding. Her distressed parents took her to a physician, who prescribed male hormones. These were taken, but were ineffective. Christie sought successfully to be excused from sports and physical education because of her embarrassment over changing clothes in front of the other boys.

By the time she was 17 years old, Christie was searching for a physician who would perform sex reassignment surgery. At 23, she enrolled in a program at the University of Texas Health Science Center that would lead to a sex reassignment operation. For four years Christie under-went psychological and psychiatric treatment by a number of physicians, some of whom testified in this case.

On August 31, 1977, Christie's name was legally changed to Christie Lee Cavazos. Under doctor's orders, Christie also began receiving various treatments and female hormones. Between November of 1979 and February of 1980, Christie underwent three surgical procedures, which culminated in a complete sex reassignment. Christie's penis, scrotum and testicles were surgically removed, and a vagina and labia were constructed. Christie additionally underwent breast construction surgery.

Dr. Donald Greer, a board certified plastic surgeon, served as a member of the gender dysphoria team at UTHSC in San Antonio, Texas during the time in question. Dr. Paul Mohl, a board certified psychiatrist, also served as a member of the same gender dysphoria team. Both participated in the evaluation and treatment of Christie. The gender dysphoria team was a mutli-disciplinary team that met regularly to interview and care for transsexual patients.

The parties stipulated that Dr. Greer and Dr. Mohl would testify that their background, training, education and experience is consistent with that reflected in their curriculum vitaes, which were attached to their respective affidavits in Christie's response to the motions for summary judgment. In addition, Dr. Greer and Dr. Mohl would testify that the definition of a transsexual is someone whose physical anatomy does not correspond to their sense of being or their sense of gender, and that medical science has not been able to identify the exact cause of this condition, but it is in medical probability a combination of neuro-biological, genetic and neonatal environmental factors. Dr. Greer and Dr. Mohl would further testify that in arriving at a diagnosis of transsexualism in Christie, the program at UTHSC was guided by the guidelines established by the Johns Hopkins Group and that,

based on these guidelines, Christie was diagnosed psychologically and psychiatrically as a genuine male to female transsexual. Dr. Greer and Dr. Mohl also would testify that true male to female transsexuals are, in their opinion, psychologically and psychiatrically female before and after the sex reassignment surgery, and that Christie is a true male to female transsexual.

On or about November 5, 1979, Dr. Greer served as a principal member of the surgical team that performed the sex reassignment surgery on Christie. In Dr. Greer's opinion, the anatomical and genital features of Christie, following that surgery, are such that she has the capacity to function sexually as a female. Both Dr. Greer and Dr. Mohl would testify that, in their opinions, following the successful completion of Christie's participation in UTHSC's gender dysphoria program, Christie is medically a woman.

Christie married a man by the name of Jonathon Mark Littleton in Kentucky in 1989, and she lived with him until his death in 1996. Christie filed a medical malpractice suit under the Texas Wrongful Death and Survival Statute in her capacity as Jonathon's surviving spouse. The sued doctor, appellee here, filed a motion for summary judgment. The motion challenged Christie's status as a proper wrongful death beneficiary, asserting that Christie is a man and cannot be the surviving spouse of another man.

The trial court agreed and granted the summary judgment. The summary judgment notes that the trial court considered the summary judgment evidence, the stipulation, and the argument of counsel. In addition to the stipulation, Christie's affidavit was attached to her response to the motion for summary judgment. In her affidavit, Christie states that Jonathon was fully aware of her background and the fact that she had undergone sex reassignment surgery.

## THE LEGAL ISSUE

■ Can there be a valid marriage between a man and a person born as a man, but surgically altered to have the physical characteristics of a woman?

## OVERVIEW OF ISSUE

This is a case of first impression in Texas. The underlying statutory law is simple enough. Texas (and Kentucky, for that matter), like most other states, does not permit marriages between persons of the same sex. *See* TEX. FAM.CODE ANN. § 2.001(b) (Vernon 1998); KY.REV.STAT. ANN. § 402.020(1)(d) (Banks–Baldwin 1999). In order to have standing to sue under the wrongful death and survival statues, Christie must be Jonathon's surviving spouse. TEX. CIV. PRAC. & REM.CODE ANN. §§ 71.004, 71.021 (Vernon 1977). The defendant's summary judgment burden was to prove she is not the surviving spouse. Referring to the statutory law, though, does not resolve the issue. This court, as did the trial court below, must answer this question: Is Christie a man or a woman? There is no dispute that Christie and Jonathon went through a ceremonial marriage ritual. If Christie is a woman, she may bring this action. If Christie is a man, she may not.

Christie is medically termed a transsexual, a term not often heard on the streets of Texas, nor in its courtrooms. If we look at other states or even other countries to see how they treat marriages of transsexuals, we get little help. Only a handful of other states, or foreign countries, have even considered the case of the transsexual. The opposition to same-sex marriages, on the other hand, is very wide spread. Only one state has ever ruled in favor of same-sex marriage: Hawaii, in the case of *Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44 (1993). All other cases soundly reject the concept of same-sex marriages. *See, e.g., Dean v. District of Columbia,* 653 A.2d 307 (D.C.1995); *Jones v. Hallahan,* 501 S.W.2d 588 (Ky.1973); *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185 (1971), *aff'd,* 409 U.S.

810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972); *Singer v. Hara,* 11 Wash.App. 247, 522 P.2d 1187 (1974). Congress has even passed the Defense of Marriage Act (DOMA), just in case a state decides to recognize same-sex marriages.

DOMA defines marriage for federal purposes as a "legal union between one man and one woman," and provides that no state "shall be required to give effect to any public act, record, or judicial proceeding of any other state respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State ... or a right or claim arising from such relationship." Defense of Marriage Act, Pub.L. No. 104–109, § 2(a), 110 Stat. 2419 (1996) (codified as amended at 28 U.S.C.A. § 1738C (West Supp.1997). So even if one state were to recognize same-sex marriages it would not need to be recognized in any other state, and probably would not be. Marriage is tightly defined in the United States: "a legal union between one man and one woman." *See id.* § 3(a).

Public antipathy toward same-sex marriages notwithstanding, the question remains: is a transsexual still the same sex after a sex-reassignment operation as before the operation? A transsexual, such as Christie, does not consider herself a homosexual because she does not consider herself a man. Her self-identity, from childhood, has been as a woman. Since her various operations, she does not have the outward physical characteristics of a man either. Through the intervention of surgery and drugs, Christie appears to be a woman. In her mind, she has corrected her physical features to line up with her true gender.

"Although transgenderism is often conflated with homosexuality, the characteristic, which defines transgenderism, is not sexual orientation, but sexual identity. Transgenderism describes people who experience a separation between their gender and their biological/anatomical sex." Mary Coombs, *Sexual Dis–Orientation:*

*Transgendered People and Same–Sex Marriage,* 8 UCLA Women's L.J. 219, 237 (1998).

Nor should a transsexual be confused with a transvestite, who is simply a man who attains some sexual satisfaction from wearing women's clothes. Christie does not consider herself a man wearing women's clothes; she considers herself a woman wearing women's clothes. She has been surgically and chemically altered to be a woman. She has officially changed her name and her birth certificate to reflect her new status. But the question remains whether the law will take note of these changes and treat her as if she had been born a female. To answer this question, we consider the law of those jurisdictions who have previously decided it.

## CASE LAW

The English case of *Corbett v. Corbett,* 2 All E.R. 33, 1970 WL 29661 (P.1970), appears to be the first case to consider the issue, and is routinely cited in later cases, including those cases from the United States. April Ashley, like Christie Littleton, was born a male, and like Christie, had undergone a sex-reassignment operation. *Id.* at 35–36. April later married Arthur Corbett. *Id.* at 39. Arthur subsequently asked for a nullification of the marriage based upon the fact that April was a man, and the marriage had never been consummated. *Id.* at 34. April resisted the nullification of her marriage, asserting that the reason the marriage had not been consummated was the fault of her husband, not her. *Id.* at 34–35. She said she was ready, willing, and able to consummate the marriage. *Id.*

Arthur testified that he was "mesmerised" by April upon meeting her, and he dated her for three years before their marriage. *Id.* at 37. He said that she "looked like a woman, dressed like a woman and acted like a woman." *Id.* at 38. Arthur and April eventually married, but they were never successful in having sexual re-

lations. *Id.* at 39. Several doctors testified in the case, as they did in the current case. *See id.* at 41.

Based upon the doctors' testimony, the court came up with four criteria for assessing the sexual identity of an individual. These are:

(1) Chromosomal factors;

(2) Gonadal factors (i.e., presence or absence of testes or ovaries);

(3) Genital factors (including internal sex organs); and

(4) Psychological factors.

*Id.* at 44.

Chromosomes are the structures on which the genes are carried which, in turn, are the mechanism by which hereditary characteristics are transmitted from parents to off-spring. *See id.* at 44. An individual normally has 23 pairs of chromosomes in his or her body cells; one of each pair being derived from each parent. *See id.* One pair of chromosomes is known to determine an individual's sex. *See id.* The English court stated that "[T]he biological sexual constitution of an individual is fixed at birth (at the latest), and cannot be changed; either by the natural development of organs of the opposite sex, or by medical or surgical means. The respondent's operation, therefore, cannot affect her true sex." *Id.* at 47. The court then reasoned that since marriage is essentially a relationship between man and woman, the validity of the marriage depends on whether April is, or is not, a woman. *Id.* at 48. The court held that the criteria for answering this question must be biological and, having so held, found that April, a transsexual, "is not a woman for the purposes of marriage but is a biological male and has been so since birth," and, therefore, the marriage between Arthur and April was void. *Id.* at 48–49. The court specifically rejected the contention that individuals could "assign" their own sex by their own volition, or by means of an operation. *Id.* at 49. In short, once a man, always a man.

The year after *Corbett* was decided in England, a case involving the validity of a marriage in which one of the partners was transsexual appeared in a United States court. This was the case of *Anonymous v. Anonymous,* 67 Misc.2d 982, 325 N.Y.S.2d 499 (N.Y.Sup.Ct.1971).

This New York case had a connection with Texas. The marriage ceremony of the transsexual occurred in Belton, while the plaintiff was stationed at Fort Hood. *Id.* at 499. The purpose of the suit was to declare that no marriage could legally have taken place. *Id.* The court pointed out that this was not an annulment of a marriage because a marriage contract must be between a man and a woman. *Id.* at 501. If the ceremony itself was a nullity, there would be no marriage to annul, but the court would simply declare that no marriage could legally have taken place. *Id.* The court had no difficulty in doing so, holding: "The law makes no provision for a 'marriage' between persons of the same sex. Marriage is and always has been a contract between a man and a woman." *Id.* at 500.

Factually, the New York case was less complicated than *Corbett,* and the instant case, because there had been no sexual change operation, and the "wife" still had normal male organs. *Id.* at 499. The plaintiff made this unpleasant discovery on his wedding night. *Id.* The husband in *Anonymous* was unaware that he was marrying a transsexual. *Id.* In both *Corbett* and the instant case, the husband was fully aware of the true state of affairs, and accepted it. In fact, in the instant case, Christie and her husband were married for seven years, and, according to the testimony, had normal sexual relations. This is a much longer period of time than any of the other reported cases.

The next reported transsexual case came from New Jersey. This is the only United States case to uphold the validity of a transsexual marriage. In *M.T. v. J.T.,* 140 N.J.Super. 77, 355 A.2d 204, 205 (1976), a transsexual wife brought an ac-

tion for support and maintenance growing out of her marriage. The husband interposed a defense that his wife was male, and that their marriage was void (and therefore he owed nothing). *Id.* M.T., the wife, testified she was born a male, but she always considered herself a female. *Id.* M.T. dated men all her life. *Id.* After M.T. met her husband-to-be, J.T., they decided that M.T. would have an operation so she could "be physically a woman." *Id.*

In 1971, M.T. had an operation where her male organs were removed and a vagina was constructed. *Id.* J.T. paid for the operation, and the couple were married the next year. *Id.* M.T. and J.T. lived as husband and wife and had sexual intercourse. *Id.* J.T. supported M.T. for over two years; however, in 1974, J.T. left the home, and his support of M.T. ceased. *Id.* The lawsuit for maintenance and support followed.

The doctor who had performed the sex-reassignment operation testified. *Id.* at 205–06. He described a transsexual as a person who has "a great discrepancy between the physical genital anatomy and the person's sense of self-identity as a male or as a female." *Id.* at 205. The doctor defined gender identity as "a sense, a total sense of self as being masculine or female; it pervades one's entire concept of one's place in life, of one's place in society and in point of fact the actual facts of the anatomy are really secondary." *Id.* The doctor said that after the operation his patient had no uterus or cervix, but her vagina had a "good cosmetic appearance" and was "the same as a normal female vagina after a hysterectomy." *Id.* at 206.

The trial court, in ruling for M.T. by finding the marriage valid, stated:

> It is the opinion of the court that if the psychological choice of a person is medically sound, not a mere whim, and irreversible sex reassignment surgery has been performed, society has no right to prohibit the transsexual from leading a normal life. Are we to look upon this person as an exhibit in a circus side show? What harm has said person done to society? The entire area of transsexualism is repugnant to the nature of many persons within our society. However, this should not govern the legal acceptance of a fact.

*Id.* at 207. The appellate court affirmed, holding:

> If such sex reassignment surgery is successful and the postoperative transsexual is, by virtue of medical treatment, thereby possessed of the full capacity to function sexually as male or female, as the case may be, we perceive no legal barrier, cognizable social taboo, or reason grounded in public policy to prevent the persons' identification at least for purposes of marriage to the sex finally indicated.

*Id.* at 210–11.

Ohio is the last state that has considered this issue. *See In re Ladrach,* 32 Ohio Misc.2d 6, 513 N.E.2d 828 (Ohio Probate Ct.1987). *Ladrach* was a declaratory judgment action brought to determine whether a male who became a post-operative female was permitted to marry a male. *Id.* at 829–30. The court decided she may not. *Id.* at 832.

Like Christie, Elaine Ladrach started life as a male. *Id.* at 830. Eventually, she had the transsexual operation which removed the penis, scrotum and testes and constructed a vagina. *Id.* The doctor who performed the operation testified that Elaine now had a "normal female external genitalia." *Id.* He admitted, however, that it would be "highly unlikely" that a chromosomal test would show Elaine to be a female. *Id.* The court cited a New York Academy of Medicine study of transsexuals that concluded: "... male to female transsexuals are still chromosomally males while ostensibly females." *Id.* at 831. The court stated that a person's sex is determined at birth by an anatomical examination by the birth attendant, which was done at Elaine's birth. *Id.* at 832. No allegation had been made that Elaine's

birth attendant was in error. *Id.* The court reasoned that the determination of a person's sex and marital status are legal issues, and, as such, the court must look to the statutes to determine whether the marriage was permissible. *Id.* The court concluded:

> This court is charged with the responsibility of interpreting the statutes of this state and judicial interpretations of these statutes. Since the case at bar is apparently one of first impression in Ohio, it is this court's opinion that the legislature should change the statutes, if it is to be the public policy of the state of Ohio to issue marriage licenses to post-operative transsexuals.

*Id.* The court denied the marriage license application. *Id.*

### OTHER AUTHORITIES

In an unreported case, a court in New Zealand was convinced that a fully transitioned transsexual should be permitted to marry as a member of his new sex because the alternative would be more disturbing. *See* Mary Coombs, *Sexual Dis–Orientation: Transgendered People and Same–Sex Marriage,* 8 UCLA WOMEN'S L.J. 219, 250 & n. 137 (1998) (citing *M. v. M.* (unreported) 30 May 1991, S.Ct. of NZ). That is, if a post-operative transsexual female was deemed a male, she could marry a woman, in what would to all outward appearances be a same-sex marriage. *Id.* The question would then become whether courts should approve seemingly heterosexual marriages between a post-operative transsexual female and a genetic male, rather than an apparent same-sex marriage between a post-operative transsexual female and a genetic female. *Id.*

The appellee cites *K. v. Health Division of Human Resources,* 277 Or. 371, 560 P.2d 1070 (1977), in his brief. That case dealt with whether a post-operative transsexual male could alter his birth certificate to change the designated gender. *Id.* The court held that the issue was a matter of public policy to be decided by the Oregon legislature. *Id.* at 376, 560 P.2d 1070. The legislature did respond to the issue, and Oregon now has a statutory provision that enables a person whose sex has been changed by surgical procedure to amend his or her birth certificate. OR. REV. STAT. § 432.235(4) (West 1999). Other states have similar statutory provisions or have interpreted their statutes to permit such an amendment to a birth certificate. *See In re Ladrach,* 513 N.E.2d at 832 (noting fifteen states have permitted a post-operative change of sex designation on birth records).

### DISCUSSION

Christie challenges the trial court's summary judgment on four issues: (1) Prange did not carry his summary judgment burden of proving, as a matter of law, that Christie's marriage was between persons of the same sex; there is no summary judgment evidence that Christie was male at the time of her ceremonial marriage to Jonathon Littleton, the deceased; (2) Prange did not carry his burden of proving, as a matter of law, that Christie was male at the time of her ceremonial marriage to Jonathon Littleton, the deceased; sex at birth is not the test for determining the sex of a true post-operative transsexual for purposes of marriage; (3) Prange did not carry his summary judgment burden of proving, as a matter of law, that Christie's marriage is void; there is no summary judgment evidence that rebuts the presumption of validity of marriage; and (4) the summary judgment should be reversed because, at the very least, Christie produced summary judgment evidence raising a genuine issue of material fact that precludes summary judgment.

▮▮▮ In an appeal from a summary judgment, we must determine whether the movant has shown that no genuine issue of material facts exists and that the movant is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Ray v. O'Neal,* 922 S.W.2d 314, 316 (Tex.App.—

Fort Worth 1996, writ denied). In determining whether a material fact issue exists to preclude summary judgment, evidence favoring the nonmovant is taken as true, and all reasonable inferences are indulged in favor of the nonmovant. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d at 548–59. Furthermore, any doubt is resolved in the nonmovant's favor. *Id.*

As previously noted, this is a case of first impression in Texas. It involves important matters of public policy for the state of Texas. The involvement of juries in the judicial process provides an important voice of the community, but we do not ask a jury to answer questions without appropriate instructions or guidelines. In fact, cases are reversed when juries have not been provided proper instructions.

In our system of government it is for the legislature, should it choose to do so, to determine what guidelines should govern the recognition of marriages involving transsexuals. The need for legislative guidelines is particularly important in this case, where the claim being asserted is statutorily-based. The statute defines who may bring the cause of action: a surviving spouse, and if the legislature intends to recognize transsexuals as surviving spouses, the statute needs to address the guidelines by which such recognition is governed. When or whether the legislature will choose to address this issue is not within the judiciary's control.

It would be intellectually possible for this court to write a protocol for when transsexuals would be recognized as having successfully changed their sex. Littleton has suggested we do so, perhaps using the surgical removal of the male genitalia as the test. As was pointed out by Littleton's counsel, "amputation is a pretty important step." Indeed it is. But this court has no authority to fashion a new law on transsexuals, or anything else. We cannot make law when no law exists: we can only interpret the written word of our sister branch of government, the legislature. Our responsibility in this case is to

determine whether, in the absence of legislatively-established guidelines, a jury can be called upon to decide the legality of such marriages. We hold they cannot. In the absence of any guidelines, it would be improper to launch a jury forth on these untested and unknown waters.

There are no significant facts that need to be decided. The parties have supplied them for us. We find the case, at this stage, presents a pure question of law and must be decided by this court.

Based on the facts of this case, and the law and studies of previous cases, we conclude:

(1) Medical science recognizes that there are individuals whose sexual self-identity is in conflict with their biological and anatomical sex. Such people are termed transsexuals.

(2) A transsexual is not a homosexual in the traditional sense of the word, in that transsexuals believe and feel they are members of the opposite sex. Nor is a transsexual a transvestite. Transsexuals do not believe they are dressing in the opposite sex's clothes. They believe they are dressing in their own sex's clothes.

(3) Christie Littleton is a transsexual.

(4) Through surgery and hormones, a transsexual male can be made to look like a woman, including female genitalia and breasts. Transsexual medical treatment, however, does not create the internal sexual organs of a women (except for the vaginal canal). There is no womb, cervix or ovaries in the post-operative transsexual female.

(5) The male chromosomes do not change with either hormonal treatment or sex reassignment surgery. Biologically a post-operative female transsexual is still a male.

(6) The evidence fully supports that Christie Littleton, born male, wants and believes herself to be a woman. She has made every conceivable ef-

fort to make herself a female, including a surgery that would make most males pale and perspire to contemplate.

(7) Some physicians would consider Christie a female; other physicians would consider her still a male. Her female anatomy, however, is all man-made. The body that Christie inhabits is a male body in all aspects other than what the physicians have supplied.

We recognize that there are many fine metaphysical arguments lurking about here involving desire and being, the essence of life and the power of mind over physics. But courts are wise not to wander too far into the misty fields of sociological philosophy. Matters of the heart do not always fit neatly within the narrowly defined perimeters of statutes, or even existing social mores. Such matters though are beyond this court's consideration. Our mandate is, as the court recognized in *Ladrach*, to interpret the statutes of the state and prior judicial decisions. This mandate is deceptively simplistic in this case: Texas statutes do not allow same-sex marriages, and prior judicial decisions are few.

■ Christie was created and born a male. Her original birth certificate, an official document of Texas, clearly so states. During the pendency of this suit, Christie amended the original birth certificate to change the sex and name. Under section 191.028 of the Texas Health and Safety Code she was entitled to seek such an amendment if the record was "incomplete or proved by satisfactory evidence to be inaccurate." TEX. HEALTH & SAFETY CODE ANN. § 191.028 (Vernon 1992). The trial court that granted the petition to amend the birth certificate necessarily construed the term "inaccurate" to relate to the present, and having been presented with the uncontroverted affidavit of an expert stating that Christie is a female, the trial court deemed this satisfactory to prove an inaccuracy. However, the trial court's role in considering the petition was a ministerial one. It involved no fact-finding or consideration of the deeper public policy concerns presented. No one claims the information contained in Christie's original birth certificate was based on fraud or error. We believe the legislature intended the term "inaccurate" in section 191.028 to mean inaccurate as of the time the certificate was recorded; that is, at the time of birth. At the time of birth, Christie was a male, both anatomically and genetically. The facts contained in the original birth certificate were true and accurate, and the words contained in the amended certificate are not binding on this court.

There are some things we cannot will into being. They just are.

## CONCLUSION

We hold, as a matter of law, that Christie Littleton is a male. As a male, Christie cannot be married to another male. Her marriage to Jonathon was invalid, and she cannot bring a cause of action as his surviving spouse.

We affirm the summary judgment granted by the trial court.

ANGELINI, J., concurring opinion.

LÓPEZ, J., dissenting opinion.

KAREN ANGELINI, Justice, concurring.

I concur in the judgment. Given the complete absence of any legislative guidelines for determining whether Texas law will recognize a marriage between a male-to-female transsexual and a male, this court is charged with making that determination. This case involves no disputed fact issues for a jury to decide, but presents this court with pure issues of law and public policy.

In his opinion, Chief Justice Hardberger has concluded, based on an analysis of other cases considering this issue, that Texas law will not recognize Christie Lee Littleton's marriage to John Mark Littleton. In doing so, Chief Justice Hardberger notes his agreement with the *Ladrach*

decision, which indicates that this is a matter best left to the legislature. He further notes, in accordance with the *Corbett* case, that because we lack statutory guidance at this time, we must instead be guided by biological factors such as chromosomes, gonads, and genitalia at birth. According to Chief Justice Hardberger, such biological considerations are preferable to psychological factors as tools for making the decision we must make. In this case, I must agree.

I note, however, that "real difficulties ... will occur if these three criteria [chromosomal, gonadal and genital tests] are not congruent." *Corbett v. Corbett*, 2 All E.R. 33, 48 (P.1970). We must recognize the fact that, even when biological factors are considered, there are those individuals whose sex may be ambiguous. *See* Julie A. Greenberg, *Defining Male and Female: Intersexuality and the Collision Between Law and Biology*, 41 Ariz. L.Rev. 265 (1999). Having recognized this fact, I express no opinion as to how the law would view such individuals with regard to marriage. We are, however, not presented with such a case at this time. *See Corbett*, 2 All E.R. at 48–49.

The stipulated evidence in the case that is before us establishes that Christie Lee Littleton was born Lee Edward Cavazos, Jr., a male. Her doctors described her as a true transsexual, which is "someone whose physical anatomy does not correspond to their sense of being or their sense of gender...." Thus, in the case of Christie Lee Littleton, it appears that all biological and physical factors were congruent and were consistent with those of a typical male at birth. The only pre-operative distinction between Christie Lee Littleton and a typical male was her psychological sense of being a female. Under these facts, I agree that Texas law will not recognize her marriage to a male.

ALMA L. LÓPEZ, Justice, dissenting.

Although the standard for reviewing a trial court's order for summary judgment is well-settled in this state, that standard is not addressed in the majority's opinion. To prevail on a motion for summary judgment, the movant must show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). In the instant case, this standard required Dr. Prange to prove that Christie Littleton was not the surviving spouse of Jonathon Littleton. To disprove this element of the plaintiff's cause of action, Dr. Prange produced only Christie's original birth certificate. This evidence, the majority concludes, is enough to prove as a matter of law that Christie Littleton is a male and that, as a result, Christie is not Jonathon's surviving spouse.

While a birth certificate would ordinarily establish a person's gender conclusively, Christie presented significant controverting evidence that indicated she was female. This evidence was so substantial that it raised a genuine issue of material fact about whether she was Jonathon's surviving spouse. In an ordinary summary judgment case, such controverting evidence would prevent this court from concluding that the movant had met its burden on a motion for summary judgment. But in this rather extraordinary case, the majority has determined that there are no significant facts that need to be determined and concluded that Christie is a male as a matter of law. Despite this conclusion, there is no law to serve as the basis of this conclusion.

The absence of controlling law precludes a judgment as a matter of law in this case. Notably, neither federal nor state law defines how a person's gender is to be determined. Our state legislature has not determined the guidelines that should govern the recognition of marriages involving transsexuals. Particularly material to this case, the legislature has not addressed whether a transsexual is to be considered a surviving spouse under the Wrongful Death and Survival Statutes. In an ordi-

nary case, the absence of such law would prevent this court from concluding that the movant was entitled to judgment as a matter of law. In the instant case, however, the majority relies on the absence of statutory law to conclude that this case presents a pure question of law that must be decided by this court rather than to allow the case to proceed to trial; that is, whether Christie is male or female.

On its surface, the question of whether a person is male or female seems simple enough. Complicated with the issues of surgical alteration, sexual identity, and same-sex marriage, the answer is not so simple. To answer the question, the majority *assumes* that gender is accurately determined at birth. Consider the basis for such a determination. Traditionally, an attending physician or mid-wife determines a newborn's gender at birth after a visual inspection of the newborn's genitalia. If the child has a penis, scrotum, and testicles, the attendant declares the child to be male. If the child does not have a penis, scrotum, and testicles, the attendant declares the child to be female. This declaration is then memorialized by a certificate of birth, without an examination of the child's chromosomes or an inquiry about how the child feels about its sexual identity. Despite this simplistic approach, the traditional method of determining gender does not always result in an accurate record of gender.

Texas law recognizes that inaccuracies occur in determining, or at least recording, gender. By permitting the amendment of an original birth certificate upon satisfactory evidence, Texas law allows these inaccuracies to be corrected. TEX. HEALTH & SAFETY CODE ANN. § 191.028 (Vernon 1992). Indeed, Christie's gender was lawfully corrected by an amended birth certificate months before the trial court ruled on Dr. Prange's motion for summary judgment. Notably, the amended birth certificate reflects the *original* filing date of April 10, 1952, the original date of birth, and an issuance date of August, 14, 1998. Reten-tion of the original filing date indicates that the amended birth certificate has been substituted for the original birth certificate in the same way an amended pleading is substituted for an original pleading in a civil lawsuit.

Under the rules of civil procedure, a document that has been replaced by an amended document is considered a nullity. Rule 65 provides that the substituted instrument takes the place of the original. TEX.R. CIV. P. 65. Although neither a state statute nor case law address the specific effect of an amended birth certificate, many cases address the effect of an amended pleading. *See Randle v. NCNB Texas Nat'l Bank*, 812 S.W.2d 381, 384 (Tex.App.—Dallas 1991, no writ) (striking of second amended pleading restored first amended pleading); *Wu v. Walnut Equip. Leasing Co.*, 909 S.W.2d 273, 278 (Tex. App.—Houston [14th Dist.] 1995) (unless substituted instrument is set aside, the instrument for which it is substituted is no longer considered part of the pleading), *rev'd on other grounds*, 920 S.W.2d 285 (Tex.1996). Under this authority, an amended instrument changes the original and is substituted for the original. Although a birth certificate is not a legal pleading, the document is an official state document. Amendment of the state document is certainly analogous to an amended legal pleading. In this case, Christie's amended birth certificate replaced her original birth certificate. In effect, the amended birth certificate nullified the original birth certificate. As a result, summary judgment was issued based on a nullified document. How then can the majority conclude that Christie is a male? If Christie's evidence that she was female was satisfactory enough for the trial court to issue an order to amend her original birth certificate to change both her name and her gender, why is it not satisfactory enough to raise a genuine question of material fact on a motion for summary judgment?

Granted the issues raised by this case are best addressed by the legislature. In the absence of law addressing those issues, however, this court is bound to rely on the standard of review and the evidence presented by the parties. Here, the stipulated evidence alone raises a genuine question about whether Christie is Jonathon's surviving spouse. Every case need not be precedential. In this case, the court is required to determine as a matter of law whether Christie is Jonathon's surviving spouse, not to speculate on the legalities of public policies not yet addressed by our legislature. Under a focused review of this case, a birth certificate reflecting the birth of a male child named Lee Cavazos does *not* prove that Christie Littleton is not the surviving spouse of Jonathan Littleton. Having failed to prove that Christie was not Jonathon's surviving spouse, Dr. Prange was not entitled to summary judgment. Because Christie's summary judgment evidence raises a genuine question of material fact about whether she is the surviving spouse of Jonathon Littleton, I respectfully dissent.