884 So.2d 155 (2004)
Linda G. KANTARAS, Appellant,
v.
Michael J. KANTARAS, Appellee.
No. 2D03-1377.
District Court of Appeal of Florida, Second District.
July 23, 2004.
Rehearing Denied September 29, 2004.
Mathew D. Staver, Erik W. Stanley, and Anita L. Staver of Liberty Counsel, Longwood, for Appellant.
Rebecca Harrison Steele of Law Office of Rebecca Harrison Steele, P.A., Tampa; Karen M. Doering, Tampa; and Collin D. Vause, Clearwater, for Appellee.
FULMER, Judge.
Linda Kantaras appeals from a final judgment dissolving her marriage to Michael Kantaras. This appeal presents an issue of first impression in Florida: whether a postoperative female-to-male transsexual person can validly marry a female under the current law of this state. We hold that the law of this state does not provide for or allow such a marriage; therefore, we reverse the final judgment and remand for the trial court to declare the marriage of the parties void ab initio.
In 1959 Margo Kantaras was born a female in Ohio. In 1986 Margo changed her name to Michael John Kantaras, and in 1987 Michael underwent sex reassignment, which included hormonal treatments, a total hysterectomy, and a double mastectomy. In 1988 Michael met Linda, and Linda learned of Michael's surgeries. Linda, who was pregnant by a former boyfriend, gave birth to a son in June 1989. Linda and Michael applied for a marriage license with Michael representing that he[1] was male. The two married *156 in July 1989 in Florida. In September 1989, Michael applied to adopt Linda's son, with Michael representing to the court that he was Linda's husband. Linda gave birth to a daughter in 1992 after Linda underwent artificial insemination with the sperm of Michael's brother.
In 1998 Michael filed a petition for dissolution of marriage seeking to dissolve his marriage to Linda and to obtain custody of both children. Linda answered and counterpetitioned for dissolution and/or annulment claiming that the marriage was void ab initio because it violated Florida law that bans same-sex marriage. Linda claimed that the adoption of her son was void because it violated Florida's ban on homosexual adoption, and she claimed that Michael was not the biological or legal father of her daughter. After a lengthy trial, the trial court entered an order finding that Michael was legally a male at the time of the marriage, and thus, the trial court concluded that the marriage was valid. The trial court also concluded that Michael was entitled to primary residential custody of the two children.
In outlining its reasons for determining that Michael was male at the time of the marriage, the trial court stated, in part:
24. Michael at the date of marriage was a male based on the persuasive weight of all the medical evidence and the testimony of lay witnesses in this case, including the following:
(a) As a child, while born female, Michael's parents and siblings observed his male characteristics and agreed he should have been born a "boy."
(b) Michael always has perceived himself as a male and assumed the male role doing house chores growing up, played male sports, refused to wear female clothing at home or in school and had his high school picture taken in male clothing.
(c) Prior to marriage he successfully completed the full process of transsexual reassignment, involving hormone treatment, irreversible medical surgery that removed all of his female organs inside of his body, including having a male reconstructed chest, a male voice, a male configured body and hair with beard and moustache, and a naturally developed penis.
(d) At the time of the marriage his bride, Linda was fully informed about his sex reassignment status, she accepted along with his friends, family and wor[k] colleagues that Michael in his appearance, characteristics and behavior was perceived as a man. At the time of the marriage he could not assume the role of a woman.
(e) Before and after the marriage he has been accepted as a man in a variety of social and legal ways, such as having a male driving license; male passport; male name change; male modification of his birth certificate by legal ruling; male participation in legal adoption proceedings in court; and as a male in an artificial insemination program, and participating for years in school activities with the children of this marriage as their father. All of this, was no different than what Michael presented himself as at the date of marriage.
25. Michael was born a heterosexual transsexual female. That condition [which] is now called "Gender Identity Dysphoria," was diagnosed for Michael in adulthood some twenty (20) years after birth. Today and at the date of marriage, Michael had no secondary female identifying characteristics and all *157 reproductive female organs were absent, such as ovaries, fallopian tubes, cervix, womb, and breasts. The only feature left is a vagina which Dr. Cole testified was not typically female because it now had a penis or enlarged, elongate[d] clitoris.
26. Michael after sex reassignment or triatic treatments would still have a chromosomal patter [sic] (XX) of a woman but that is a presumption. No chromosomal tests were performed on Michael during the course of his treatment at the Rosenberg Clinic.
27. Chromosomes are only one factor in the determination of sex and they do not overrule gender or self identity, which is the true test or identifying mark of sex. Michael has always, for a lifetime, had a self-identity of a male. Dr. Walter Bockting, Dr. Ted Huang and Dr. Collier Cole, all testified that Michael Kantaras is now and at the date of marriage was medically and legally "male."
28. Under the marriage statute of Florida, Michael is deemed to be male, and the marriage ceremony performed in the Sandford [sic] County Court house on July 18, 1989, was legal.
The issue in this case involves the interplay between the Florida statutes governing marriage and the question of whether Michael Kantaras was legally male or female when he married Linda. We first address the relevant statutes and then discuss our reasons for concluding that the trial court erred in finding that Michael was male at the time of the marriage.
The Florida Legislature has expressly banned same-sex marriage. As amended in 1977 by chapter 77-139, Laws of Florida, the statute governing the issuance of a marriage license, at the time one was issued in this case, provided that no license shall be issued unless one party is a male and the other a female:
No county court judge or clerk of the circuit court in this state shall issue a license for the marriage of any person unless there shall be first presented and filed with him an affidavit in writing, signed by both parties to the marriage, made and subscribed before some person authorized by law to administer an oath, . . . and unless one party is a male and the other party is a female.
§ 741.04(1), Fla. Stat. (1987). In 1997, the legislature enacted the Florida Defense of Marriage Act, prohibiting marriage between persons of the same sex:
(1) Marriages between persons of the same sex entered into in any jurisdiction, whether within or outside the State of Florida, the United States, or any other jurisdiction, either domestic or foreign, or any other place or location, or relationships between persons of the same sex which are treated as marriages in any jurisdiction, whether within or outside the State of Florida, the United States, or any other jurisdiction, either domestic or foreign, or any other place or location, are not recognized for any purpose in this state.
(2) The state, its agencies, and its political subdivisions may not give effect to any public act, record, or judicial proceeding of any state, territory, possession, or tribe of the United States or of any other jurisdiction, either domestic or foreign, or any other place or location respecting either a marriage or relationship not recognized under subsection (1) or a claim arising from such a marriage or relationship.
(3) For purposes of interpreting any state statute or rule, the term "marriage" means only a legal union between one man and one woman as husband and *158 wife, and the term "spouse" applies only to a member of such a union.
§ 741.212, Fla. Stat. (Supp.1998).
Courts in Ohio, Kansas, Texas, and New York have addressed issues involving the marriage of a postoperative transsexual person, and in all cases the courts have invalidated or refused to allow the marriage on the grounds that it violated state statutes or public policy. In the case of In re Ladrach, 32 Ohio Misc.2d 6, 513 N.E.2d 828 (Probate 1987), the court found that a postoperative male-to-female transsexual was not permitted to marry a male. "[T]here is no authority in Ohio for the issuance of a marriage license to consummate a marriage between a post-operative male to female transsexual person and a male person." Id. at 832.
This court is charged with the responsibility of interpreting the statutes of this state.... Since the case at bar is apparently one of first impression in Ohio, it is this court's opinion that the legislature should change the statutes, if it is to be the public policy of the state of Ohio to issue marriage licenses to postoperative transsexuals.
Id.
More recently an Ohio appellate court agreed with the decision in Ladrach and affirmed a trial court's denial of a marriage license to a postoperative female-to-male transsexual and a female. See In re A Marriage License for Nash, Nos.2002-T-0149, 2002-T-0179, 2003 WL 23097095 (Ohio Ct.App. Dec. 31, 2003). Noting that "Ohio, like most states, has a clear public policy that authorizes and recognizes marriages only between members of the opposite sex," the court concluded that the term "male" as used in the marriage statute does not include a female-to-male postoperative transsexual. Id. at *5-6. Agreeing with the court in Ladrach that it was the responsibility of the legislature to change the public policy, the court stated that it was "loath to expand the statutory designation of individuals who may marry through judicial legislation." Id. at *7.
The Kansas Supreme Court declared a marriage void after it found that a postoperative male-to-female transsexual was not a woman. See In re Estate of Gardiner, 273 Kan. 191, 42 P.3d 120 (2002), cert. denied, 537 U.S. 825, 123 S.Ct. 113, 154 L.Ed.2d 36 (2002). Gardiner, a probate case, involved the question of who was the rightful heir to the intestate estate of Marshall Gardiner: Gardiner's son, Joe, or J'Noel Gardiner, a male-to-female transsexual who married Marshall Gardiner the year before his death. Id. at 122. Joe sought summary judgment on the ground that J'Noel's marriage to Marshall was void. Id. at 123. The district court granted summary judgment concluding that the marriage was void under Kansas law on the ground that J'Noel was a male. Id. The court of appeals reversed and directed the district court to determine whether J'Noel was male or female at the time the marriage license was issued, taking into account a number of factors in addition to chromosomes. Id. at 132-34. The Supreme Court of Kansas granted Joe's petition for review and reversed the decision of the court of appeals, concluding that the district court had properly entered summary judgment on the ground that J'Noel's marriage to Marshall was void. Id. at 136-37.
The supreme court concluded that the issue on appeal was one of law, not fact, and it involved the interpretation of the Kansas statutes. Id. at 135. The court recognized that "[t]he fundamental rule of statutory construction is that the intent of the legislature governs." Id. After discussing the common meaning of the terms sex, male, and female, the court stated:

*159 The words "sex," "male," and "female" in everyday understanding do not encompass transsexuals. The plain, ordinary meaning of "persons of the opposite sex" contemplates a biological man and a biological woman and not persons who are experiencing gender dysphoria. A male-to-female post-operative transsexual does not fit the definition of a female. The male organs have been removed, but the ability to "produce ova and bear offspring" does not and never did exist. There is no womb, cervix, or ovaries, nor is there any change in his chromosomes. As the Littleton court noted, the transsexual still "inhabits ... a male body in all aspects other than what the physicians have supplied." 9 S.W.3d at 231. J'Noel does not fit the common meaning of female.
Id. at 135.
In response to the court of appeals' conclusion that a question remained as to whether J'Noel was a female at the time the license was issued for the purpose of the statute, the supreme court stated:
We do not agree that the question remains. We view the legislative silence to indicate that transsexuals are not included. If the legislature intended to include transsexuals, it could have been a simple matter to have done so. We apply the rules of statutory construction to ascertain the legislative intent as expressed in the statute. We do not read into a statute something that does not come within the wording of the statute.
Id. at 136 (citation omitted). The supreme court stated further:
[T]he legislature clearly viewed "opposite sex" in the narrow traditional sense.... We cannot ignore what the legislature has declared to be the public policy of this state. Our responsibility is to interpret [the statute] and not to rewrite it. ... If the legislature wishes to change public policy, it is free to do so; we are not. To conclude that J'Noel is of the opposite sex of Marshall would require that we rewrite [the statute].
Id. at 136-37. The supreme court concluded that "the validity of J'Noel's marriage to Marshall is a question of public policy to be addressed by the legislature and not by this court." Id. at 137.
In Littleton v. Prange, 9 S.W.3d 223 (Tex.App.1999), the Texas court found a marriage between a man and a postoperative male-to-female transsexual void. Christie Littleton, the transsexual, married Jonathon Mark Littleton in Kentucky in 1989. Id. at 225. After Jonathon's death in 1996, Christie sued Dr. Prange for medical malpractice in her capacity as Jonathon's surviving spouse. Id. The doctor moved for summary judgment asserting that Christie was a man and could not be the surviving spouse of another man. Id. The trial court agreed and granted summary judgment. Id.
The appeals court concluded that the case presented a pure question of law. Id. at 230.
In our system of government it is for the legislature, should it choose to do so, to determine what guidelines should govern the recognition of marriages involving transsexuals....
It would be intellectually possible for this court to write a protocol for when transsexuals would be recognized as having successfully changed their sex.... But this court has no authority to fashion a new law on transsexuals, or anything else. We cannot make law when no law exists: we can only interpret the written word of our sister branch of government, the legislature.
Id. at 230. The court concluded "as a matter of law, that Christie Littleton is a male. As a male, Christie cannot be married *160 to another male. Her marriage to Jonathon was invalid, and she cannot bring a cause of action as his surviving spouse." Id. at 231.
New York courts have also refused to recognize transsexual marriage. See Anonymous v. Anonymous, 67 Misc.2d 982, 325 N.Y.S.2d 499 (1971); Frances B. v. Mark B., 78 Misc.2d 112, 355 N.Y.S.2d 712 (1974). In Frances B., the plaintiff, a woman, filed an annulment action claiming that, prior to the marriage, the defendant (a postoperative female-to-male transsexual) fraudulently represented himself as a male, although the defendant did not have male sex organs and was still a woman. 355 N.Y.S.2d at 713. The defendant moved to amend his answer to include a counterclaim for divorce on the ground of abandonment. Id. at 714. The court, noting the public policy that the marriage relationship exists for the purpose of begetting offspring, concluded that the defendant's sex reassignment surgery did not enable the defendant to perform male sexual functions in a marriage:
Assuming, as urged, that defendant was a male entrapped in the body of a female, the record does not show that the entrapped male successfully escaped to enable defendant to perform male functions in a marriage. Attempted sex reassignment by mastectomy, hysterectomy, and androgenous hormonal therapy, has not achieved that result.
Id. at 717. Thus, the court concluded that, as a matter of law, the defendant had no basis to counterclaim for divorce. Id. at 716-17.
There is one case in the United States that has permitted transsexual marriage. In M.T. v. J.T., 140 N.J.Super. 77, 355 A.2d 204 (1976), the husband sought an annulment on the ground that his wife was a male-to-female transsexual. The New Jersey court rejected the husband's argument, upheld the validity of the marriage, and affirmed a judgment of the lower court obligating the husband to support the transsexual as his wife. 355 A.2d at 211. After considering the medical evidence, the court held that when a transsexual person has successfully undergone sex-reassignment and can fully function sexually in the reassigned sex, then the person could marry legally as a member of the sex finally indicated. Id. at 210-11.
In sum, it has been established that an individual suffering from the condition of transsexualism is one with a disparity between his or her genitalia or anatomical sex and his or her gender, that is, the individual's strong and consistent emotional and psychological sense of sexual being. A transsexual in a proper case can be treated medically by certain supportive measures and through surgery to remove and replace existing genitalia with sex organs which will coincide with the person's gender. If such sex reassignment surgery is successful and the postoperative transsexual is, by virtue of medical treatment, thereby possessed of the full capacity to function sexually as a male or female, as the case may be, we perceive no legal barrier, cognizable social taboo, or reason grounded in public policy to prevent that person's identification at least for purposes of marriage to the sex finally indicated.
Id. at 210-11.
In the case before us, the trial court relied heavily on the approach taken by an Australian family court in In re Kevin, (2001) 28 Fam. L.R. 158, aff'd, 30 Fam. L.R. 1 (Austl.Fam.Ct.2003) (pagination of Lexis printout), which the trial court believed "correctly states the law in modern society's approach to transsexualism." In that case, the Australian court took the view that courts must recognize advances *161 in medical knowledge and practice and found that a female-to-male transsexual should be considered a man for purposes of marriage. Australia prohibits same-sex marriage; nevertheless, the court ruled that a marriage between a woman and a postoperative female-to-male transsexual was valid. In affirming the trial court, the Family Court of Australia stated in its conclusion:
Should the words "man" and "marriage" as used in the Marriage Act 1961 bear their contemporary ordinary everyday meaning?
....
Unless the context requires a different interpretation, the words "man" and "woman" when used in legislation have their ordinary contemporary meaning according to Australian usage. That meaning includes post-operative transsexuals as men or women in accordance with their sexual reassignment....
30 Fam. L.R. 1 at 48.
On appeal, Michael argues that the trial court properly adopted the approach taken by the Australian court. He further argues that the approach taken by the majority of courts in the United States that have addressed the issue of transsexual marriage ignore modern medical science. We disagree.
The controlling issue in this case is whether, as a matter of law, the Florida statutes governing marriage authorize a postoperative transsexual to marry in the reassigned sex. We conclude they do not. We agree with the Kansas, Ohio, and Texas courts in their understanding of the common meaning of male and female, as those terms are used statutorily, to refer to immutable traits determined at birth. Therefore, we also conclude that the trial court erred by declaring that Michael is male for the purpose of the marriage statutes. Whether advances in medical science support a change in the meaning commonly attributed to the terms male and female as they are used in the Florida marriage statutes is a question that raises issues of public policy that should be addressed by the legislature. Thus, the question of whether a postoperative transsexual is authorized to marry a member of their birth sex is a matter for the Florida legislature and not the Florida courts to decide. Until the Florida legislature recognizes sex-reassignment procedures and amends the marriage statutes to clarify the marital rights of a postoperative transsexual person, we must adhere to the common meaning of the statutory terms and invalidate any marriage that is not between persons of the opposite sex determined by their biological sex at birth. Therefore, we hold that the marriage in this case is void ab initio.
Our holding that the marriage is void ab initio does not take into consideration the best interests of the children involved in this case. While we recognize that the trial judge went to great lengths to determine the best interests of the children, the issue of deciding primary residential custody was dependent on the trial court's conclusion that the marriage was valid. We do not attempt to undertake a determination of the legal status of the children resulting from our conclusion that the marriage is void. The legal status of the children and the parties' property rights will be issues for the trial court to examine in the first instance on remand.
Reversed and remanded with directions to grant the counterpetition for annulment declaring the marriage between the parties void ab initio.
COVINGTON and WALLACE, JJ., Concur.
NOTES
[1] Our references to Michael Kantaras as "he" throughout this opinion are not intended to carry a legal significance.