OPINION
{¶ 1} This matter arises from two separate appeals. First, Jacob B. Nash ("Nash") and Erin A. Barr ("Barr"), a female, (together "the applicants") appeal the September 20, 2002 judgment entry of the Trumbull County Court of Common Pleas, Probate Division, denying their application for a marriage license. The applicants further appeal the November 25, 2002 judgment entry of the Trumbull County Court of Common Pleas, Probate Division, denying their second application for a marriage license. For the reasons set forth below, we affirm the decisions of the trial court in this matter.
 {¶ 2} Nash was born Pamela Ann McAloney, a female, on November 17, 1964, in Massachusetts. At that time, Massachusetts issued a birth certificate designating Nash's sex as female. Nash's birth certificate was subsequently amended to reflect a change in name to Pamela Ann Nash following Nash's adoption.
 {¶ 3} Nash eventually married Michael Stephen Michalak. On May 6, 1998, Nash and Michalak were divorced in Massachusetts. Nash relocated to Warren, Ohio, in April 1999. Nash applied for a legal name change from Pamela Ann Nash to Jacob Benjamin Nash with the Trumbull County Court of Common Pleas on December 30, 1999. A copy of Nash's then current Massachusetts birth certificate designating Nash as female was submitted along with the application for name change. Nash's application for name change was granted on July 5, 2000.
 {¶ 4} Soon thereafter, application to amend Nash's Massachusetts birth certificate to reflect a change in sex designation from female to male was made to the City Clerk of Fitchburg, Massachusetts. Along with the application, Nash submitted a copy of the entry granting the name change and a letter from Dr. Samuel Detwiler, Nash's family physician, indicating that Nash had undergone gender reassignment surgery. An amended birth certificate in the name of Jacob Benjamin Nash with a designation as a male was issued on April 25, 2002. Nash subsequently obtained an amended Ohio driver's license changing the sex designation from female to male.
 {¶ 5} On August 2, 2002, the applicants applied for a marriage license. In the application, the applicants failed to declare Nash's former marriage. Upon a search of the court's records, the court noticed the previous court entry granting Nash's name change from Pamela Ann Nash to Jacob Benjamin Nash. When Nash returned to pick up the marriage license, Nash was informed that the license would not issue.
 {¶ 6} The matter subsequently was set for an evidentiary hearing on September 5, 2002. Prior to the hearing, the applicants submitted an unsigned amended application for a marriage license to the court indicating that Nash was previously married.
 {¶ 7} The applicants testified at the evidentiary hearing that the failure to indicate Nash's previous marriage was a mere oversight. The trial court, however, found that the applicants' "explanation that they forgot the previous marriage and divorce when they completed the original application lacks credibility." The trial court further found that the applicants' "omission of [Nash's previous marriage] was intentional and made with the purpose of misleading the court." Thus, the trial court ordered "that the marriage license of Jacob B. Nash and Erin A. Barr shall not issue pursuant to R.C. 3101.05(C) as the statements regarding the previous marriage are false."
 {¶ 8} The applicants timely appealed the trial court's decision. On October 2, 2002, and during the pendency of the appeal, the applicants submitted a second application for a marriage license properly disclosing Nash's previous marriage. An evidentiary hearing was set for November 5, 2002. Nash claims to be a post-operative female-to-male transsexual. Upon the advice of counsel, however, Nash refused to answer any of the trial court's questions pertaining to Nash's sex reassignment surgeries. Nash's attorney argued that these questions were irrelevant because of Nash's designation as male on the amended Massachusetts birth certificate.
 {¶ 9} The trial court found that "the refusal of Jacob B. Nash to permit the Court to make reasonable inquiry permitted by R.C. 3101.05
prevents the court from determining if the requirements for a marriage license have been met under the Ohio statutes." Thus, the trial court denied the applicant's second application for a marriage license.
 {¶ 10} Again, the applicants timely appealed the trial court's decision. The two separate appeals were consolidated by this court on January 21, 2003. Citizens for Community Values ("CCV") filed a motion for leave to file a brief amicus curiae pursuant to Ohio App. R. 17, and to participate in oral arguments. On May 5, 2003, this court granted CCV's motion for leave to file a brief amicus curiae. CCV's request to participate in oral arguments, however, was denied.
 {¶ 11} The Trumbull County Prosecutor's Office ("prosecutor's office") filed a merit brief on behalf of the Trumbull Court of Common Pleas, Probate Division, ("trial court") as appellee. The prosecutor's office alternatively moved for leave to file a brief amicus curiae. The applicants moved to strike the prosecutor's office's merit brief. Because the trial court is not a party to this action, this court granted the applicants' motion to strike the brief on May 5, 2003. The prosecutor's office, however, was granted leave to file a brief amicus curiae in this matter on May 5, 2003.
 {¶ 12} Thus, this consolidated appeal is properly before this court. The applicants raise the following assignments of error in this consolidated appeal:
 {¶ 13} "[1.] The trial court erred in holding appellant's application for a marriage license to a higher evidentiary standard than the standard to which it holds other applications, thereby denying appellants equal protection of the laws under the United States Constitution and the Constitution of the State of Ohio.
 {¶ 14} "[2.] The trial court erred in refusing to give full faith and credit to Jacob Nash's valid, corrected Massachusetts birth certificate when he presented it in support of appellants' application for a marriage license."
 {¶ 15} In their first assignment of error, the applicants argue that the trial court violated their Fourteenth Amendment guarantee of equal protection by requiring from Nash more than a driver's license, which the applicants claim "is usually dispositive proof of a person's identity, age and sex."
 {¶ 16} The Fourteenth Amendment provides that "[n]o state shall * * * deny to any person within its jurisdiction the equal protection of the laws." "[E]qual protection analysis requires strict scrutiny of legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." Massachusetts Bd. of Retirementv. Murgia (1976), 427 U.S. 307, 312. Otherwise, the classification is subject to rational basis analysis, i.e. whether there exists some rational relationship to a legitimate governmental interest. Graham v.Richardson (1971), 403 U.S. 365, 371-372.
 {¶ 17} Although transsexuals do not constitute a suspect class,Holloway v. Arthur Anderson Co. (C.A. 9 1977), 566 F.2d 659, 663, the right to marry has long been recognized as a fundamental right. SeeZablocki v. Redhail (1978), 434 U.S. 374, 383-384. "[N]ot * * * every state regulation which relates in any way to the incidents of or prerequisites for marriage[, however,] must be subject to rigorous scrutiny." Id. at 386. "[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." Id.
 {¶ 18} R.C. 3101.05 is a reasonable regulation that does not significantly interfere with decisions to enter into the marital relationship and, thus, for purposes of equal protection analysis, the statute is entitled to examination under the rational basis standard. States possess a legitimate interest in protecting the institute of marriage within its borders. See Section 1738C, Title 28 U.S.Code. R.C.3101.05's requirements are, at least, rationally related to further that legitimate interest by insuring that no legal impediments to a proposed marriage exist.
 {¶ 19} Moreover, the statute, as applied to the applicants, does not violate their equal protection rights. In applying an equal protection analysis, states "must treat like cases alike but may treat unlike cases accordingly." Vacco v. Quill (1997), 521 U.S. 793, 799, citing Plyler v. Doe (1982), 457 U.S. 202, 216. Thus, "a law that is applicable to all persons under like circumstances and does not subject individuals to an arbitrary exercise of power does not violate an individual's right to equal protection." Shockey v. Winfield (1994),97 Ohio App.3d 409, 412, citing Conley v. Shearer (1992), 64 Ohio St.3d 284,288-289.
 {¶ 20} The probate court has exclusive jurisdiction to grant marriage licenses, R.C. 2101.24(A)(1)(f), and possesses "plenary power * * * to dispose fully of any matter that is properly before the court * * *." R.C. 2101.24(C). When processing a marriage license application, "[i]f the probate judge is satisfied that there is no legal impediment and if one or both of the parties are present, the probate judge shall grant the marriage license." R.C. 3101.05(A). Thus, although a marriage license will normally issue based upon the sworn license application and submission of proper identification, when evidence arises that indicates the possible existence of a legal impediment to the marriage or raises a question regarding an applicant's identification, the court can do what is reasonable and necessary under the circumstances to quell the court's concerns and properly dispose of the matter.
 {¶ 21} In this case, the court, through a cursory search of its records, discovered evidence that raised a question about the identification and sexual designation of Nash. Thus, when the court required further information from Nash and conducted an evidentiary hearing on the matter, it violated neither of the applicants' equal protection rights. Rather, it was treating like cases alike and unlike cases accordingly. The court cannot be expected to turn a blind eye to evidence that comes before it that could possibly foreclose the issuance of a marriage license. Rather, the court is permitted to proceed with the case accordingly, including requiring additional information or conducting an evidentiary hearing on the matter.
 {¶ 22} Moreover, in the face of the evidence before the court, the court was not only permitted to require additional information from Nash, as well as conduct an evidentiary hearing on the matter, it was required to do what was necessary to insure that the issuance of the marriage license was proper and valid. In other words, this case was not the usual case and the court was required to treat this case accordingly. In doing so, the applicants' equal protection rights were not violated.
 {¶ 23} The applicants' first assignment of error is, therefore, overruled.
 {¶ 24} In their second assignment of error, the applicants argue that Nash's amended Massachusetts birth certificate designating Nash a male was entitled to full faith and credit as a public act or record of another state. The applicants further argue that there is no public policy in Ohio prohibiting a transsexual from changing the sex designation on his or her birth certificate or from marrying a member of his or her biological sex.
 {¶ 25} "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof." Section 1, Article IV, United States Constitution. Congress has prescribed that another state's records "shall have the same full faith and credit in every court and office within the United States * * * asthey have by law or usage in the courts or offices of the State * * *from which they are taken." Sections 1738, 1739, Title 28, U.S. Code (emphasis added). Thus, Ohio courts must give the same effect to records from Massachusetts as that record would be given by Massachusetts courts themselves. See Holzemer v. Urbanski, 86 Ohio St.3d 129, 136,1999-Ohio-91.
 {¶ 26} Although Massachusetts permits a post-operative transsexual to amend his or her original birth certificate to "reflect the newly acquired sex," Mass. Gen. Laws, Chapter 46, Section 13(e), "[t]he record * * * relative to birth * * * shall be prima facie evidence of the facts recorded * * *." Mass. Gen. Laws, Chapter 46, Section 19. A birth certificate submitted as evidence in a Massachusetts court is, therefore, not conclusive proof of the facts recorded therein, but is only prima facie evidence of those facts. Miles v. Edward O. Tabor,M.D., Inc. (Mass. 1982), 443 N.E.2d 1302, 1304.
 {¶ 27} "`Prima facie evidence means evidence which not only remains evidence throughout the trial but also has up to a certain point an artificial legal force which compels the conclusion [by the trier of fact] that the evidence is true,' Cook v. Farm Serv. Stores, 301 Mass. 564,566 (1938), until it is rebutted. Once evidence is introduced contradicting the prima facie evidence, the prima facie evidence need be given `only the weight that . . . [it] deserve[s] in the estimation of the [trier of fact]. Id. at 569." Miles, 443 N.E.2d at 1304.
 {¶ 28} In this case, the amended birth certificate submitted by Nash as evidence of his sex was rebutted by the evidence already in possession of the trial court, to wit, Nash's original birth certificate designating Nash's sex as female. Thus, the trial court gave Nash's amended Massachusetts birth certificate the proper full faith and credit, prima facie evidence of the facts contained therein.
 {¶ 29} Moreover, since each state retains some attributes of sovereignty and, thus, may enact its own laws and, in effect, define its own public policy, see Pacific Emp. Ins. Co. v. Indus. Accident Comm.
(1939), 306 U.S. 493, 501; Bhd. of Locomotive Firemen Enginemen v.Chicago, Rock Island Pacific RR. Co. (1968), 393 U.S. 129, 142
("policy decisions are for the state legislature") (citation omitted);Kassel v. Consol. Freightways Corp. (1981), 450 U.S. 662, 691
(Rehnquist, J., dissenting) ("forming public policy [is a] function
which * * * [was] left by the Framers of the Constitution to state legislators"), the full faith and credit clause is not violated when granting full faith and credit to another state's records would violate the public policy of the state applying the other state's records. SeeNevada v. Hall (1979), 440 U.S. 410, 422; Pink v. A.A.A. HighwayExpress, Inc. (1941), 314 U.S. 201, 210; Atlantic Fin. Co. v. Fisher
(1962), 173 Ohio St. 387, 389; Gibson v. Bolner (1956), 165 Ohio St. 357,361.
 {¶ 30} Ohio, like most states, has a clear public policy that authorizes and recognizes marriages only between members of the opposite sex. See Am.Sub.H.B. No. 272 ("Any marriage between persons of the same sex is against the strong public policy of this state. Any marriage between persons of the same sex shall have no legal force or effect in this state and, if attempted to be entered into in this state, is void ab initio and shall not be recognized by this state."); R.C. 3101.01
(designating that only "male persons * * * and female persons * * * may be joined in marriage"); In re Bicknell, 96 Ohio St.3d 76,2002-Ohio-3615, at ¶ 20 (Lundberg Stratton, J., dissenting); Gajovskiv. Gajovski (1991), 81 Ohio App.3d 11, 13 ("Ohio law permits marriage only between members of the opposite sex.") (citations omitted); In reLadrach (1987), 32 Ohio Misc.2d 6, 9. In fact, the pertinent language of R.C. 3101.01 designating that "male persons * * * and female persons * * * may be joined in marriage" has not changed since the original statute was enacted as part of the General Code. See Peefer v. State (1931),42 Ohio App. 276, 284 ("Section 11181, General Code of Ohio defines who may contract marriage in Ohio. This section is as follows: `Male persons of the age of eighteen years, and female persons of the age of sixteen years * * * may be joined in marriage.'").
 {¶ 31} In addition, public policy in Ohio concerning changes to birth certificates is to allow a court to "correct Errors/MistakesOnly on the original birth record," and not changes in the sexual designation when the original designation was correct. See http://www.odh.state.oh.us/VitStats/la_correct.htm (visited Sept. 4, 2003) (emphasis sic) (the official website of Ohio Department of Health, which pursuant to R.C. 3705.02 has the authority to "adopt rules as necessary to insure that this state shall have a complete and accurate registration of vital statistics"). Even if Ohio permitted changes to the sexual designation as noted on the original birth certificate, this would not affect the clear public policy authorizing and recognizing only marriages between members of the opposite sex.
 {¶ 32} "[W]hen words are not defined in a statute they are to be given their common and ordinary meaning absent a contrary legislative intent." Moore Personnel Serv., Inc. v. Zaino, 98 Ohio St.3d 337,2003-Ohio-1089, at ¶ 15. A female is defined as "the sex that produces ova or bears young," while a male is defined as "the sex that has organs to produce spermatozoa for fertilizing ova." Webster's II New College Dictionary (1999). Thus, the "words * * * `male,' and `female' in everyday understanding do not encompass transsexuals." In re Estate ofGardiner (Kan. 2002), 42 P.3d 120, 135. Further, since "words [that] are employed in a statute which had at the time a well-known meaning * * * are presumed to have been used in that sense unless the context compels to the contrary," Standard Oil Co. v. United States (1911), 221 U.S. 1,59, and since the statutory language in question was enacted in the early 1900s, without change, it cannot be argued that the term "male," as used at that time, included a female-to-male post-operative transsexual.
 {¶ 33} Thus, this court agrees with the court in Ladrach that "if it is to be the public policy of the state of Ohio to issue marriage licenses to post-operative transsexuals" to marry someone who has the same biological sex as the transsexual, it is the responsibility of the legislature to make the necessary statutory changes to reflect this change in public policy. 32 Ohio Misc.2d at 10. Moreover, as Justice Lundberg Stratton expressed concern about in her dissent in Bicknell,
courts should not, by judicial legislation, place a "stamp of state approval" on any act that "is directly contrary to the state's position against same-sex * * * marriages." 96 Ohio St.3d 76, at ¶ 20 ("By our decision today, we have judicially read into a statute an interpretation that I do not believe the General Assembly intended. Allowing unmarried couples, whether homosexual or heterosexual, to legally assume the same last name with the stamp of state approval is directly contrary to the state's position against same-sex and common-law marriages, neither of which Ohio recognizes. This is a social policy decision that should clearly be made by the General Assembly after full public debate and discourse, not by judicial legislation."). Justice Lundberg Stratton's concern in Bicknell is amplified in this case because, in permitting this marriage to proceed, we would be placing our "stamp of state approval" on an actual marriage that is directly contrary to Ohio's public policy on same-sex marriages, rather than approving a name change that only would give the intimation of a same-sex marriage, as was the case in Bicknell.
Thus, this would start us down the slippery slope to judicially legislating same-sex marriages, an area within the purview of the legislature alone.
 {¶ 34} Further, it has been over 15 years since the decision inLadrach was announced and over 12 years since the decision in Gajovski
was announced. In that time, the legislature amended R.C. 3101.01 four times without changing the relevant language designating that only "male persons * * * and female persons * * * may be joined in marriage." "A reenactment of legislation, without modification after judicial interpretation, is further indication of implied legislative approval of such interpretation." Seeley v. Expert, Inc. (1971), 26 Ohio St.2d 61,72-73. Since the legislature has not changed the pertinent wording of R.C. 3101.01, even in light of the Gajovski and Ladrach decisions, and has remained silent regarding the issue of sexual designation of a post-operative transsexual, this court is loath to expand the statutory designation of individuals who may marry through judicial legislation. See Hancock Mut. Life Ins. Co. v. Warren (1901), 181 U.S. 73, 76-77 ("It [is] for the legislature of Ohio to define the public policy of that State"); Bicknell, 96 Ohio St.3d 76, at ¶ 20 (Lundberg Stratton, J., dissenting) ("This is a social policy decision that should clearly be made by the General Assembly after full public debate and discourse, not by judicial legislation."); Gardiner, 42 P.3d at 136 ("We view the legislative silence to indicate that transsexuals are not included. If the legislature intended to include transsexuals, it could have been a simple matter to have done so.").
 {¶ 35} After an extensive review of the case law throughout the country, other courts faced with the issue of a transsexual's sex designation have come to similar conclusions. In Gardiner, 42 P.3d at136-137, the Supreme Court of Kansas stated:
 {¶ 36} "[T]he legislature clearly viewed `opposite sex' in the narrow traditional sense. The legislature has declared that the public policy of this state is to recognize only the traditional marriage between `two parties who are of the opposite sex,' and all other marriages are against public policy and void. We cannot ignore what the legislature has declared to be the public policy of this state. Our responsibility is to interpret K.S.A 2001 Supp. 23-101 and not to rewrite it. That is for the legislature to do if it so desires. If the legislature wishes to change public policy, it is free to do so; we are not. To conclude that [the post-operative male-to-female transsexual] is of the opposite sex of [the deceased male] would require that we rewrite K.S.A. 2001 Supp. 23-101.
 {¶ 37} "Finally, we recognize that [the post-operative male-to-female transsexual] has traveled a long and difficult road. [The post-operative male-to-female transsexual] has undergone electrolysis, thermolysis, tracheal shave, hormone injections, extensive counseling, and reassignment surgery. Unfortunately, after all that, [the post-operative male-to-female transsexual] remains a transsexual, and a male for purposes of marriage under K.S.A. 2001 Supp. 23-101. We are not blind to the stress and pain experienced by one who is born a male and perceives oneself as a female. We recognize that there are people who do not fit neatly into the commonly recognized category of male or female, and to many life becomes an ordeal. However, the validity of [the post-operative male-to-female transsexual's] marriage to [the deceased male] is a question of public policy to be addressed by the legislature and not by this court."
 {¶ 38} Similarly, in Littleton v. Prange (Tex.App. 1999),9 S.W.3d 223, 230-231, the Fourth District Court of Appeals of Texas stated:
 {¶ 39} "In our system of government it is for the legislature, should it choose to do so, to determine what guidelines should govern the recognition of marriages involving transsexuals. * * *
 {¶ 40} "It would be intellectually possible for this court to write a protocol for when transsexuals would be recognized as having successfully changed their sex. Littleton has suggested we do so, perhaps using surgical removal of the male genitalia as the test. As was pointed out by Littleton's counsel, `amputation is a pretty important step." Indeed it is. But this court has no authority to fashion a new law on transsexuals, or anything else. We cannot make law when no law exists: we can only interpret the written word of our sister branch of government, the legislature. * * *
 {¶ 41} "We recognize that there are many fine metaphysical arguments lurking about here involving desire and being, the essence of life and the power of mind over physics. But courts are wise not to wander too far into the misty fields of sociological philosophy. Matters of the heart do not always fit neatly within the narrowly defined perimeters of statutes, or even existing social mores. Such matters though are beyond this court's consideration. Our mandate is, as the court recognized in Ladrach, to interpret the statutes of the state and prior judicial decisions. This mandate is deceptively simplistic in this case: Texas statutes do not allow same-sex marriages, and prior judicial decisions are few."
 {¶ 42} Finally, in Ulane v. Eastern Airlines, Inc. (C.A. 7 1984),742 F.2d 1081, 1086-1087, the United States Court of Appeals for the Seventh District stated:
 {¶ 43} "In our view, to include transsexuals within the reach of Title VII far exceeds mere statutory interpretation. Congress had a narrow view of sex in mind when it passed the Civil Rights Act, and it has rejected subsequent attempts to broaden the scope of its original interpretation. For us to now hold that Title VII protects transsexuals would take us out of the realm of interpreting and reviewing and into the realm of legislating. See Gunnison v. Commissioner, 461 F.2d 796, 499 (7th Cir. 1972) (it is for the legislature, not the courts, to expand the class of people protected by a statute). This we must not and will not do.
 {¶ 44} "Congress has a right to deliberate on whether it wants such a broad sweeping of the untraditional and unusual within the term `sex' as used in Title VII. Only Congress can consider all the ramifications to society of such a broad view. We do not believe that the interpretation of the word `sex' as used in the statute is a mere matter of expert medical testimony or the credibility of witnesses produced in court. Congress may, at some future time, have some interest in testimony of that type, but it does not control our interpretation of Title VII based on the legislative history or lack thereof. If Congress believes transsexuals should enjoy the protection of Title VII, it may so provide. Until that time, however, we decline in behalf of the Congress to judicially expand the definition of sex as used in Title VII beyond its common and traditional interpretation. * * *
 {¶ 45} "[I]f the term sex as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress."
 {¶ 46} Like the courts in Ladrach, Gardiner, Littleton, and Ulane,
we must emphasize that any change to Ohio's public policy concerning transsexuals and marriage or expanding the definition of male and female in R.C. 3101.01 to permit a post-operative transsexual to marry someone who has the same biological sex as the transsexual must come from the legislature. Since the Ohio legislature clearly has neither changed the public policy regarding marriages and transsexuals, as expressed in R.C.3101.01 and interpreted in Gajovski and Ladrach, nor expanded the definition of male or female beyond their common and traditional interpretations, a marriage between a post-operative female-to-male transsexual and a biological female is void as against public policy. SeeGajovski, 81 Ohio App.3d at 13 ("Ohio law permits marriage only between members of the opposite sex. * * * This requirement applies even in a situation where one party has obtained such gender status by means of transsexual surgery; in the contemplation of Ohio jurisprudence, one's gender at birth is one's gender throughout life.") (citations omitted);Ladrach, 32 Ohio Misc.2d at 10 ("there is no authority in Ohio for the issuance of a marriage license to consummate a marriage between a post-operative male to female transsexual person and a male person"). Thus, the trial court was not required to grant full faith and credit to Nash's amended Massachusetts birth certificate because to do so would infringe on clear Ohio public policy against same-sex marriages.
 {¶ 47} For these reasons, the applicants' second assignment of error is without merit.
 {¶ 48} Since, based upon the holding above, the issuance of a marriage license to the applicants would violate clear Ohio public policy, there is no need for this court to examine whether the applicants' rights were violated when the first application for a marriage license was declined for the applicants' failure to declare Nash's previous marriage. Regardless of whether the failure to declare Nash's prior marriage was sufficient to deny the first application, any marriage license issued by the court would have been void as against public policy.
 {¶ 49} For the foregoing reasons, we conclude that the trial court did not violate the applicants' equal protection rights when denying issuance of their marriage license. We further conclude that the trial court was not required to give full faith and credit to Nash's Massachusetts birth certificate because to do so would violate clear Ohio public policy. Thus, we hold that the applicants' assignments of error are without merit. The decision of the Trumbull County Court of Common Pleas, Probate Division, is affirmed.
Donald R. Ford, P.J., concurs with a concurring opinion.
Judith A. Christley, J., dissents with a dissenting opinion.