OPINION
{¶ 1} Appellant Victoria Smith is appealing the judgment of the Jefferson County Court of Common Pleas, transferring custody of her children to their father in post-dissolution proceedings. The case revolves around the parties' older son, now twelve years old, who has exhibited signs from a very early age that he wanted to be treated as a girl. In 2001, Appellant was designated as the child's residential parent as part of the dissolution. While the child was in her care, she supported and encouraged him in his belief that he is a girl. She allowed him to wear girl's clothing, to go by the name Christine, to participate in transgender support groups, and to be generally treated as a girl.
 {¶ 2} In 2004, Appellant moved from Toronto, Ohio to Niles, Ohio, to enroll her son in school as a transgender child. This prompted Appellee to request the trial court for a change of custody, and after lengthy proceedings, he was designated as the residential parent.
 {¶ 3} Appellant's arguments on appeal are that the court interfered with medical decisions concerning her child, failed to find that she was harming her son, and failed to consider the impact of the change of custody on the parties' younger son. We cannot find any reversible error in the trial court proceedings, and the custody determination is affirmed.
 FACTS AND PROCEDURAL HISTORY {¶ 4} Victoria and Kevin were married on June 4, 1994. On March 26, 2001, they filed a petition for dissolution of marriage in the Jefferson County Court of Common Pleas. They also filed a separation agreement in which Appellant was *Page 2 
designated as the residential parent of their two minor children. The older boy was six at the time of the dissolution. He was born on September 28, 1994. The younger son was born on September 7, 1998, and was two at the time of the dissolution.
 {¶ 5} On May 7, 2001, the court filed a decree of dissolution, and adopted the separation agreement. Appellant was designated as the residential parent of both children, and Appellee was granted standard visitation.
 {¶ 6} On April 16, 2004, Appellee filed a motion for reallocation of parental rights and termination of child support. Appellee requested to be designated the residential parent. Appellee's attached affidavit alleged that Appellant had moved to Niles, Ohio to enroll their older son in a new school as a girl under the name of Christine; that she was taking the child to a transgender support group; and that she intended to subject the boy to hormonal therapy and surgery to alter his gender.
 {¶ 7} On April 16, 2004, the court issued an emergency temporary order reallocating parental rights of the two boys to Appellee. On April 26, 2004, the parties signed an agreed temporary judgment entry, in which they would share the designation of residential parent. In the judgment entry Appellant was ordered: to stop any treatment or counseling for gender disorder; to stop the child from attending transgender support groups; to stop addressing the boy as Christine or any other female name; and to stop allowing or encouraging him to wear girl's clothing. Appellant was also ordered to return to Toronto, Ohio, and to re-enroll the boys in school there. The court absolutely prohibited the parties from treating or counseling *Page 3 
the boy for gender identity disorder (hereinafter "GID") throughout the pendency of the dispute.
 {¶ 8} On July 20, 2004, Appellee filed for an emergency order terminating the prior shared parenting plan. Appellee alleged that Appellant violated the plan by taking his son to a swimming pool dressed in a girl's bikini swimsuit. A hearing was held on the motion on September 9, 2004. Four expert witnesses testified, and a large body of other evidence was submitted, including various photos and videotapes of the boy.
 {¶ 9} On September 24, 2004, the court issued an order reallocating parental rights and responsibilities. Based on the evidence from the recent parental rights reallocation hearings and the prior record of the dissolution case, the trial court found that Appellant's son had displayed some female tendencies, including an attraction to female clothing, as early as age two. The court found that, at a very early point in the child's life, Appellant conducted independent research into gender identity issues and concluded that he had GID. She did not consult any medical professionals at this time. By the time the boy was four, Appellant allowed him to dress in girl's clothes and told him he could be a girl someday. Appellee was aware of some of these events prior to the dissolution, but was generally unaware of the extent of the child's interest in female clothing and behavior.
 {¶ 10} The court noted that Appellant and Appellee separated in January of 2000, when the boy was five. After the marriage was dissolved in 2001, Appellee *Page 4 
had very little contact with his children. Appellant was the residential parent of both children and the primary adult influence in their lives.
 {¶ 11} The court found that in the spring of 2003, Appellant told Appellee that their older son had GID. Appellant's conclusion was based on internet research and support group information. Appellee did not accept this conclusion, and produced photos and videos that showed the boy enjoying stereotypical male activities and wearing male clothing.
 {¶ 12} In November 2003, Appellant's older son (now at age nine) sent an email to Appellee stating that "God made a mistake" about his gender. He also included photos of himself in girl's clothing.
 {¶ 13} During Appellee's visitation periods, Appellant would send along both girl's and boy's clothing, as well as Barbie dolls, for her son to use. Appellee kept the dolls, but was not aware whether the boy played with them.
 {¶ 14} In 2004, Appellant moved from Toronto, Ohio, to Niles, Ohio, and enrolled her old son in school as a transgender child. Appellant intended for him to go to school dressed in girl's clothing and using a girl's name. Neither Appellee nor the court was consulted in these decisions. Soon afterward, Appellee filed his motion for reallocation of parental rights and for emergency temporary orders. When he picked up his son in Niles after the first temporary order, the child was wearing girl's clothes.
 {¶ 15} On July 29, 2004, Appellant's older son sent a videotape to Appellee. The videotape recorded the child sitting in a chair and talking about his gender, trying *Page 5 
to explain the situation to his father. The boy stated numerous times on the tape that he is a girl, wants to be a girl, and that he would like to live a normal life as a girl. He stated that he looked forward to the time when he could wear girl's clothes all the time. He stated that he is a girl even if he does not have all the body parts of a girl. He expressed a desire to either go to school as a girl or be home-schooled. He also stated a number of times that he hoped his father would understand the situation, but that no matter what, he intended to become a girl. The child was also upset by the fact that his father sent a "spy" to Geauga Lake to get a picture of the boy in a bikini.
 {¶ 16} Appellee was very upset by this tape. Prior to receiving the tape, Appellee had not had any discussions with his older son about gender or related issues, even though he had known about some of the boy's feelings and gender behavior since before the dissolution, and was brought up to date on all events in the spring of 2003. On August 1, 2004, Appellee told his son that the men in his transgender group have sex with other men. (9/9/04 Tr., p. 78.) On August 2, 2004, Appellee told the boy that his behavior was an attempt to gain attention and to win the approval of his mother. The child responded by saying, "you're probably right." (9/9/04 Tr., p. 78.)
 {¶ 17} The trial court's judgment entry concluded that Appellant disobeyed prior court orders concerning her older son. The court noted that Appellant took the boy to Geauga Lake and allowed him to wear a bikini, which was captured on film by Appellee or someone hired by him. Appellant also referred to her son as "Christine" when introducing him to a woman named Stephanie Boltz. At some point, Appellant *Page 6 
began calling her son by the name "Christmas," which the trial judge concluded was a violation of his order not to refer to him by a female name. The judge also noted that, during the very hearing on the motion to reallocate parental rights, Appellant repeatedly referred to the boy as "she" and then corrected herself. Based on these four findings, the court concluded that Appellant could not be counted on to follow any court order that she might disagree with.
 {¶ 18} During the September 9, 2004, hearing, each party called two expert witnesses to testify about GID. The trial court concluded from these experts that GID is a real condition that affects between 1 out of 30,000 and 1 out of 100,000 people. The court accepted the "Diagnostic and Statistical Manual of Mental Disorders, 4th
("DSM-IV") standard for diagnosing GID:
 {¶ 19} 1. Repeatedly stating a desire to be or insisting that the child is the other sex.
 {¶ 20} 2. A preference for cross-dressing or wearing attire typical of the opposite sex.
 {¶ 21} 3. Strong and persistent preferences for and admiration of cross-sex roles in play or fantasies.
 {¶ 22} 4. Strong or intensive desire to participate in the stereotypical games and activities of the other sex.
 {¶ 23} 5. Strong preference for playmates of the other sex.
 {¶ 24} The court concluded that a person needed to display at least four of the indicators to be properly diagnosed with GID. *Page 7 
 {¶ 25} The court found that once GID has been diagnosed, various treatment methods are available. One type of treatment is "real-life experience", meaning that the child would dress as a girl and assume the role of a girl full-time. The court rejected this as a legitimate method of treating the disorder. (J.E., p. 6.) Another type of treatment is hormonal therapy. The first phase of hormonal treatment starts at puberty to delay the onset of puberty. The rationale is to give the child more time to make an informed decision about his or her gender. The second phase comes after "real-life experience" and after the person has already made the decision to become the opposite gender. Hormones are administered to suppress the physiological characteristics of the biological gender and to develop the characteristics of the desired gender. A third type of treatment is gender reassignment by surgery. Since Appellant's older son was only 9 years and 11 months old at the time of the hearing, none of the doctors recommended starting hormonal treatment at that time.
 {¶ 26} Appellee called Dr. Warren Throckmorton, Ph.D., and Dr. Richard Fitzgibbons, M.D. Dr. Throckmorton met with the boy twice. Dr. Throckmorton concluded that the boy clearly displayed two of the DSM-IV factors, partially displayed one other factor, and that two factors were completely missing. He concluded that the child did not have GID and did not recommend "real-life experience" or hormonal treatment.
 {¶ 27} Dr. Fitzgibbons met with Appellee and then met privately with the child. Dr. Fitzgibbons concluded that the boy did not have GID and did not recommend *Page 8 
"real-life experience" or hormonal treatment. He recommended counseling. The court concluded that Dr. Fitzgibbons' analysis was a mixture of psychology and religion, and the court discounted his testimony.
 {¶ 28} Appellant called Dr. Gregory Lehne, Ph.D., and Dr. Richard Pleak, M.D. Dr. Lehne examined the boy on August 1, 2003, and diagnosed him with GID. The court was not convinced, though, that Dr. Lehne had any clear criteria for the diagnosis, and the court referred to the doctor's methodology as "voodoo." (9/24/04 J.E., p. 8.) The court also noted that Dr. Lehne appeared to change his mind during cross-examination, first recommending "real-life experience" and hormone treatment, and later concluding that more study involving the entire family was necessary.
 {¶ 29} Dr. Pleak testified that GID is very rare, perhaps affecting 1 in 100,000 people, and that he has personally treated about 100 people with the disorder. Dr. Pleak met with the boy on February 10, 2004. The doctor also interviewed Appellant, and she revealed that her son had exhibited cross-gender behavior as early as age one. Dr. Pleak considered this to be typical of GID. He stated that he knew of no children over the age of 10 and who had previously manifested signs of GID to ever stop manifesting those signs. He stated that it is not unusual for children with GID to be able to manifest the typical behavior of their biological gender to avoid trouble, harm, or grief to others. Dr. Pleak concluded that the boy met the DSM-IV criteria for GID, although the doctor considered him to be too young to actually be evaluated under the DSM-IV standards. He recommended that the child be permitted to explore the true nature of his gender, including the ability to wear girl's clothing. Dr. *Page 9 
Pleak was not ready to recommend full-time "real-life experience" unless he could conduct further interviews and establish more of a case history. Dr. Pleak also recommended more intensive therapy instead of simple counseling.
 {¶ 30} The court discounted Dr. Pleak's testimony because he did not sufficiently rely on the DSM-IV standards, and because his diagnosis was based, in part, on statements made by Appellant that she had not been encouraging female tendencies in the boy until very recently. The court believed that Appellant had been encouraging her son to be a girl from at least age four.
 {¶ 31} The court agreed with Dr. Pleak's conclusion that the GID diagnosis in children often changes between ages 8 and 10. Dr. Pleak stated that children between ages 8 and 10, "usually exhibit much less cross-gender identification than they did earlier." (9/9/04 Tr., p. 577.) The trial court faulted Appellant for, "clouding the issue of what [the boy's] feelings would have been at this point had Mother been more supportive of [his] masculine identity or even remained neutral." (9/24/04 J.E., p. 9.)
 {¶ 32} The court concluded that two of the doctors found the boy to be suffering from GID, and two did not. None of the doctors recommended full-time "real-life experience," at least not without further study, and none of the doctors recommended hormonal treatment, at least not in the near future and not without further study. The court believed that Appellant was determined to carry out both types of treatment, despite the conclusions of the medical experts. *Page 10 
 {¶ 33} On September 13, 2004, the court conducted its own interview of the boy. During the interview, the child expressed a desire to wear girl's clothes and to have "girl stuff," although he did not specify what "girl stuff" meant. The court found that the boy enjoyed stereotypical male activities such as wrestling with this brother, shooting his BB gun, and playing video games. The boy did not talk about participating in any stereotypical female activities except for wearing girl's clothes. The court also found that the child's friends were all boys, and that he appeared to be attracted to one particular girl who was not attracted to him. The boy did not report being attracted to any boys except as general friends. He was not able to name any female heroes or idols. The court did not notice the boy exhibit any female mannerisms during the in camera interview.
{1134} The trial judge also viewed the July 29, 2004, videotape in which the boy tried to explain his feelings to his father. The judge was not convinced that the boy was sincere in this videotape and did not believe he was exhibiting any female characteristics in this tape.
 {¶ 35} The judge filed a judgment entry on September 24, 2004, modifying the earlier orders governing parental rights. The court gave Appellee custody of the children from Tuesday to Sunday, and gave Appellant custody from Sunday to Tuesday. Each parent was designated as residential parent during their periods of custody. The court ordered the parties to keep both children enrolled in Toronto City Schools. The court ordered the older son to receive counseling if Appellant and Appellee could agree on a counselor, and if not, the court would choose one. The *Page 11 
boy was not to be encouraged or permitted to wear girl's clothes. He was not permitted to go by a girl's name or be referred to as "she" or "her." Appellant was specifically ordered not to refer to the boy by the name "Christmas." The child was not permitted to attend transgender support groups and was to become "disassociated with that lifestyle," absent agreement of both parties or further order of the court. Both Appellant and Appellee were ordered to obtain psychological evaluations of themselves and of their son. The purpose of the evaluations was to "aid the Court to determine, among other things, whether Mother is pushing [the child] toward a feminine identity or if Father simply fails to see that which is plainly there to be seen." (9/24/04 J.E., p. 13.)
 {¶ 36} The court also put Appellant on notice that "given her prior history of disobeying Court Orders that a very small infraction may well result in her receiving only supervised visitation." (9/24/04 J.E., p. 13.)
 {¶ 37} On October 28, 2004, the court issued a journal entry clarifying that the September 24th judgment was not a final appealable order, and that the court would issue its final order after the psychological evaluations were submitted to the court.
 {¶ 38} On December 7, 2004, the court designated Mark King, Ph.D. as the doctor to perform the psychological evaluations, based on the parties' inability to agree on a doctor. Dr. King submitted his report on July 30, 2005, and a supplemental hearing took place on August 12, 2005. At the hearing, Dr. King stated that this was the most difficult case he had ever dealt with. He stated that Appellant's decision to treat the boy as if he were a girl and as if he had GID was a mistake, but *Page 12 
he could not say to what degree it might have caused harm to the child. (8/12/05 Tr., p. 9.) He could not give a diagnosis as to whether the boy suffered from GID. He stated that the child was a very feminized male, and that "five years down the road it might go the other way." (8/12/05 Tr., p. 9.) He recommended that Appellant's older son be raised as a biological boy. (8/12/05 Tr., p. 10.) Dr. King noted that the boy was depressed, and he mentioned suicide as a worst case scenario possibility. (8/12/05 Tr., pp. 20-21.) Dr. King stated that, although he disagreed with some of the actions that Appellant took regarding her older son, "her motivations were honest." (8/12/05 Tr., p. 23.) He believed that Appellant always acted in the child's best interests. (8/12/05 Tr., p. 25.) He concluded that Appellant would follow court orders in the future, even if she were designated as the sole residential parent. (8/12/05 Tr., p. 26.)
 {¶ 39} On August 19, 2005, the court issued its final order in this case. The court noted that no material facts had changed since its temporary order of September 24, 2004, and incorporated that order by reference into its current judgment. The court did find, though, that a material change in circumstances had occurred since the prior final order of May 7, 2001, referring to the dissolution decree. The court disagreed with some of Dr. King's conclusions. The court found that Appellant was not likely to comply with future court orders, and that her prior failure to obey the court's orders undermined what the court was trying to accomplish in the current proceedings. The court then modified the 2001 custody order and designated Appellee as the sole residential parent. The court also found that the *Page 13 
harm likely to be caused by the change of environment was greatly outweighed by the advantages of changing the children's environment. This timely appeal followed.
 ASSIGNMENTS OF ERROR {¶ 40} "The Trial Court Erred By Changing Custody Based On The Trial Court's Disagreement With The Mother's Medical Decisions.
 {¶ 41} "The Trial Court's Decision To Change Custody Was Not Supported By The Evidence.
 {¶ 42} "The Trial Court Erred As A Matter Of Law And Abused Its Discretion By Failing To Consider The Best Interests Of The Parties' Younger Child."
 {¶ 43} This appeal involves a modification to a prior custody order in a dissolution case. Custody orders are reviewed for abuse of the trial court's discretion. Davis v. Flickinger (1997), 77 Ohio St.3d 415, 416,674 N.E.2d 1159; Miller v. Miller (1988), 37 Ohio St.3d 71, 74,523 N.E.2d 846. An abuse of discretion refers to an order that is unreasonable, unconscionable or arbitrary. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 44} The custody dispute in this case arose because of an alleged misdiagnosis or misperception by the residential parent that she was raising a transgender child, and because of the mother's allegedly improper responses to her son's gender attitudes and behavior. There is virtually no caselaw in Ohio dealing with transgender issues in any form, much less involving childhood gender disorders in the context of a custody battle. The only case that even discusses transgender themes in any form involved a transgender male attempting to obtain a marriage *Page 14 
license in Trumbull County. In re Marriage License for Nash, 11th Dist. Nos. 2002-T-0149, 2002-T-0179, 2003-Ohio-7221. Not surprisingly, that appeal generated three separate opinions written by each of the three appellate judges on the panel. The lack of relevant caselaw makes our task that much more difficult in this appeal.
 {¶ 45} In order for a court to reallocate parental rights and responsibilities and change the residential parent, it is required to find that a change in circumstances has occurred since the prior custody order; that the change in custody is in the best interests of the child; and that the benefits of the change in custody outweigh the harm caused by the change. These requirements are found in R.C. § 3109.04(E)(1), which states:
 {¶ 46} "(E)(1)(a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
 {¶ 47} "(i) The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent. *Page 15 
 {¶ 48} "(ii) The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.
 {¶ 49} "(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."
 {¶ 50} "The clear intent of [R.C. § 3109.04(E)(1)(a)] is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a `better' environment. The statute is an attempt to provide some stability to the custodial status of children, even though the parent out of custody may be able to prove that he or she can provide a better environment." Wyss v. Wyss (1982),3 Ohio App.3d 412, 416, 445 N.E.2d 1153.
 {¶ 51} In determining the best interests of the child in a change of custody dispute, the court is also required to consider the factors listed in R.C. § 3109.04(F) before changing custody:
 {¶ 52} "(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
 {¶ 53} "(a) The wishes of the child's parents regarding the child's care; *Page 16 
 {¶ 54} "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 55} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 56} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 57} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 58} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 59} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 60} "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household *Page 17 
that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 61} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 62} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 63} We must note at the beginning of our analysis that Appellant's arguments on appeal do not address the basic principles that a trial court must follow in modifying a prior custody decision. The starting point in a modification of custody action is whether there was a change in circumstances since the prior final custody order that supports the court's intervention. Davis, supra, 77 Ohio St.3d at 416,674 N.E.2d 1159. As R.C. § 3109.04(E)(1) states, the finding of a change in circumstances can be based on, "facts that * * * were unknown to the court at the time of the prior decree[.]"
 {¶ 64} Appellant's move to Niles, Ohio, was probably not a sufficient change in circumstances in itself to support a modification of custody, because the 2001 Separation Agreement specifically stated that each party, "may reside at such place *Page 18 
or places as he or she may select," and there was no further requirement to notify or obtain court approval for Appellant to move her place of residence. This Court has held that the residential parent's relocation, by itself, is not a sufficient change in circumstances. Rohrbaugh v.Rohrbaugh (2000), 136 Ohio App.3d 599, 604, 737 N.E.2d 551. Nevertheless, the purpose of the Appellant's move to Niles was to enroll her son in school as a girl or as a transgender child, ostensibly because the school system in Niles was more tolerant of transgender students. As far as the court was concerned, the entire subject of the boy being treated as a transgender child was a new circumstance that was not raised during the dissolution proceedings. Add to this the fact that Appellant apparently came to the conclusion that the boy suffered from GID without consulting medical professionals, was taking the boy to GID support group meetings before obtaining any medical diagnosis, and was entertaining the idea of hormone treatment or surgery for the child. There was even testimony that the child had considered suicide because of the gender disorder. (9/24/04 Tr., p. 365.) Thus, most of the facts regarding gender identity problems arose after the initial dissolution decree, and these facts support the trial court's conclusion that there was a change of circumstances justifying a reconsideration of the prior custody order.
 {¶ 65} Once a change in circumstances is demonstrated, the court must determine the best interests of the child or children and whether the benefits of changing custody outweigh the harm that will be caused by it. R.C. § 3109.04(E)(1)(a). The court made these determinations by consulting the views of *Page 19 
five expert witnesses, as well as considering the testimony of the parties, the various exhibits (including a number of videotapes), and the judge's in camera session with the older boy. The court concluded that the child did show interest in girl's clothing, but that he did not have GID, should not be treated for it, and that Appellant could not be trusted to obey any court orders concerning the child's gender confusion. The court concluded that Appellant pushed the boy into believing that he was a transgender child. Partly as a way to counteract Appellant's improper influence on the boy, the judge modified custody and named Appellee as the residential parent. It is within this context, centering on whether there was a change of circumstances and whether the custody decision is in the best interests of the children, that Appellant's arguments must be viewed.
 {¶ 66} Appellant's first argument challenges what is portrayed as judicial meddling with basic child-rearing decisions. There is no denying Appellant's argument that parents have fundamental constitutional rights in the care, custody and management of their children. In re Murry (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, citing Santosky v. Kramer (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599; Stanley v. Illinois (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551; Meyer v. Nebraska (1923), 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042. Appellant uses this general statement of well-established law to further argue that the court had no authority to interfere in what she considers to be medical issues involving her son. Appellant is mistaken. Once parties initiate divorce or dissolution proceedings, they necessarily involve the court system in their lives and the lives of any children *Page 20 
affected by the divorce or dissolution. Myers v. Parks,167 Ohio App.3d 329, 2006-Ohio-2352, 855 N.E.2d 112; Schaeffer v. Schaeffer, 1st Dist. Nos. C-020721, C-030255, C-020722, C-030385, C-020723, 2004-Ohio-2032. In a divorce or dissolution action, the court is called upon to exert the authority of parens patriae, which literally means "parent of his or her country," and refers to the role of the state as sovereign and guardian of children and others under legal disability. Kelm v.Kelm (2001), 92 Ohio St.3d 223, 228, 749 N.E.2d 299. The court has the authority and duty to make custody rulings in the best interests of the children in a divorce or dissolution action, and retains continuing jurisdiction to modify those rulings under certain circumstances. See R.C. § 3109.04.
 {¶ 67} Appellant's contention that the court improperly interfered with her right to make medical decisions for her child appears to be a challenge to the initial jurisdiction of the court to be involved in this case at all, and completely ignores the fact that the court was already involved by way of the dissolution action. Be that as it may, Appellant cites Parham v. J.R. (1978), 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101, in support of her argument. The Parham case was a class action suit challenging Georgia's procedure for admitting minor children to state mental hospitals. The children were suing to be released from the hospitals based on violations of their due process rights. The children had been admitted to the hospitals by their parents or guardians. In this context, the Supreme Court held:
 {¶ 68} "In defining the respective rights and prerogatives of the child and parent in the voluntary commitment setting, we conclude that our precedents permit *Page 21 
the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply. We also conclude, however, that the child's rights and the nature of the commitment decision are such that parents cannot alwayshave absolute and unreviewable discretion to decide whether to have achild institutionalized. They, of course, retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." (Emphasis added.) Id. at 604.
 {¶ 69} The context of the instant case is completely different than that of Parham, and furthermore, Parham itself concluded that there are limits to parental discretion in making medical decisions for children. The Parham case does not, in the final analysis, support Appellant's position on appeal.
 {¶ 70} In Appellant's second argument she questions whether her actions posed a harm to her son, and whether there was any harm that justified the change in custody. Appellant is correct that, even though a court may be asked to modify prior custody orders in a divorce or dissolution, "there exists a presumption that retaining the original residential parent is in the best interests of the child." In reJeffreys (Feb. 20, 2002), 7th Dist. No. 01-BA-4; R.C. §3109.04(E)(1)(a). This is a rebuttable presumption.
 {¶ 71} Appellant further argues that the trial court was required to find that her child-rearing decisions posed a harm to the child in order to justify a change of custody. Appellant contends that the court did not make this finding, and because *Page 22 
there was no such finding, the presumption in favor of retaining her as the residential parent should prevail.
 {¶ 72} Again, Appellant is incorrect in her argument. Although a trial court starts with the presumption that the current residential parent is acting in the best interests of the child, this presumption is rebuttable by any evidence, not necessarily evidence that the residential parent is harming the child. What the trial court is required to find is that the harm in changing custody is outweighed by the advantages of changing custody. R.C. § 3109.04(E)(1)(a)(iii). The trial court clearly made this finding. The trial court determined that Appellant's older son needed to be in an environment where he could be treated like a boy and allowed to develop as a boy, so that he could make a more informed decision about his gender at a later point in life. The court interviewed the boy in camera, and did not sense anything particularly feminine about him. The court found that the boy had little interest in being a girl other than in his desire to wear girl's clothing. The court observed that the child acted like a girl only when he was around his mother, and seemed to have no trouble behaving like a typical boy when he was with his father. The court concluded that Appellant may be forcing her son to become a girl. The court decided that by making Appellee the residential parent, the child would be permitted to find out if he was only acting like a girl to please his mother, or if he really was a transgender child. Thus, the trial court conducted the analysis that it was required to do and relied on substantial rebuttal evidence to overcome the presumption of retaining the current residential parent. *Page 23 
 {¶ 73} Appellant's contention that custody may only be changed based on a finding of harm to the child sounds somewhat similar to the requirement that custody cannot be modified unless a change in circumstances occurs, and that change of circumstance must be, "an event occurrence, or situation which has a material and adverse effect upon a child." Rohrbaugh, supra, 136 Ohio App.3d at 604-605, 737 N.E.2d 551, quoting Wyss, supra, 3 Ohio App.3d 412, 445 N.E.2d 1153. As already explained, though, the child's apparent gender identity problems were having an adverse effect on him, to the point that he discussed suicide, and this more than justified a finding of a change in circumstances and allowed the court to then consider modifying custody in the best interests of the child.
 {¶ 74} Appellant's next argument is that the trial court failed to consider all the best interest factors in R.C. § 3109.04(F) in making its decision. As Appellant points out, R.C. § 3109.04(F) requires the trial court to consider how the change in custody will affect any siblings in the household:
 {¶ 75} "the court shall consider all relevant factors, including * * *
 {¶ 76} "* * *
 {¶ 77} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 78} "* * *
 {¶ 79} "(e) The mental and physical health of all persons involved in the situation;" *Page 24 
 {¶ 80} Appellant contends that the trial court completely failed to consider how the change in custody would affect the younger child. Appellant's argument is not persuasive. The trial court was well aware that there was a younger brother involved in the custody dispute. Although the main focus of the change of custody proceedings was the older son's gender identity issues, there was periodic discussion of the younger son as well. There was testimony attempting to establish that the older boy was somewhat jealous of his younger brother, and that this may have contributed to some of the gender confusion. The record shows that the two boys seemed to get along well with each other and spent a considerable amount of time together. Thus, it was not surprising that the court found that it was in the best interests of the children for Appellee to become the residential parent of both boys. Although the trial court may not have specifically recited each best interest factor in rendering its judgment, there is no requirement that the court do so. As we have recently held in another modification of custody case: "This Court has generally relied on the presumption of correctness that adheres to a trial court's decision, and has accepted that the trial court considered the relevant factors unless the record clearly shows otherwise." In re Jeffreys (Feb. 20, 2002), 7th Dist. No. 01-BA-4.
 {¶ 81} Although this case reveals some of the severe limitations in using the judicial system to resolve complex and possibly controversial childrearing and childhood mental health issues, we are bound by the law in this matter. Further, there is nothing to prevent the mother from filing her own request for change of custody should the circumstances change; for instance, on the onset of puberty for *Page 25 
the older child or a more clear and concise medical diagnosis. On the record before us, there is no reversible error apparent, and the judgment of the Jefferson County Court of Common Pleas is affirmed.
 Donofrio, J., and Vukovich, J., concurs. *Page 1